# United States Court of Appeals for the Federal Circuit

2008-1606

SKY TECHNOLOGIES LLC,

Plaintiff-Appellee,

v.

SAP AG and SAP AMERICA, INC.,

Defendant-Appellant.


     Alexandra G. White, Susman Godfrey L.L.P., of Houston, Texas, argued for plaintiff-appellee.  With her on the brief were Brian D. Melton, Max L. Tribble, Jr. and Anne Mullins.

     Paul S. Grewal, Howrey LLP, Cupertino, California, argued for defendant-appellant.  With him on the brief were Lloyd R. Day, Jr., Robert M. Galvin and Renee DuBord Brown.  Of counsel was Sriranga Veeraraghaven.

Appealed from:  United States District Court for the Eastern District of Texas

Judge David Folsom

# United States Court of Appeals for the Federal Circuit

2008-1606

SKY TECHNOLOGIES LLC,

Plaintiff-Appellee,

v.

SAP AG and SAP AMERICA, INC.,

Defendant-Appellant.

Appeal from the United States District Court for the Eastern District of Texas in case no. 2:06-CV-440, Judge David Folsom.

_____

DECIDED: August 20, 2009

_____

Before MICHEL, Chief Judge, BRYSON, Circuit Judge, and SPENCER, Chief District Judge.[*]

SPENCER, Chief District Judge.

Appellants SAP AG and SAP America, Inc. ("SAP") filed an interlocutory appeal from the judgment of the United States District Court for the Eastern District of Texas finding that Sky Technologies LLC has standing to bring a patent infringement suit in the district court. Because the district court correctly relied on the holding in Akazawa v.

_____

[*] The Honorable James R. Spencer, Chief Judge, United States District Court for the Eastern District of Virginia, sitting by designation.

<u>Link New Technology International, Inc.</u>, 520 F.3d 1354 (Fed. Cir. 2008), to determine that patent ownership was properly transferred by operation of state foreclosure law, giving Appellee clear title to the patents-in-suit and therefore standing in the underlying case, we affirm.

## I. BACKGROUND

Jeffrey Conklin ("Conklin") founded TradeAccess, Inc. ("TradeAccess") in 1996. Conklin, along with other inventors, obtained a portfolio of patents, which are the subject of this suit.[1]  Conklin and the other inventors assigned all of their "right[s], title[s], and interest together with the benefits and privileges in and to said inventions and discoveries" to TradeAccess.  These assignments were recorded with the United States Patent and Trademark Office ("PTO").  TradeAccess later changed its name to Ozro, Inc. ("Ozro").

On April 2, 2001, Ozro, the Grantor, executed an Intellectual Property Security Agreement with Silicon Valley Bank ("SVB") ("SVB Agreement"), granting SVB a "security interest in all of Grantor's right, title, and interest, whether presently existing or hereafter acquired in, to and under all of the Collateral."  The Collateral included the patents-in-suit.[2]  The SVB Agreement was filed with the PTO on April 2, 2001.  On April 3, 2001, Ozro executed a similar security agreement with Cross Atlantic Capital

---

[1]    U.S. Patent Nos. 6,141,653; 6,336,105; 6,338,050; 7,162,458; and 7,149,724.

[2]    Specifically, the Agreement gave SVB "a first priority security interest in all of Grantor's right, title, and interest throughout the world in . . . (d) [a]ll inventions, rights

Partners, Inc. ("XACP") ("XACP Agreement"), for the benefit of the XACP Entities.[3] The XACP Agreement contained virtually identical language as the SVB Agreement. Ozro used both Agreements to secure loans, and, in the event of default by Ozro, both parties had "the right to exercise all the remedies of a secured party upon such default under the Massachusetts UCC," including the right

> (i) to take possession of all or any portion of the Intellectual Property Collateral, (ii) to sell, lease, or otherwise dispose of any or all of the Intellectual Property Collateral . . . and (iii) to exercise all or any of the rights, remedies, powers, privileges and discretions under all or any of the documents relating to the Secured Obligations.

Moreover, in the event of default, Ozro would be required to "assemble the Intellectual Property Collateral and any tangible property in which [SVB or XACP] has a security interest and to make it available to [SVB or XACP]." The XACP Agreement also contained a specific provision providing for disposition of the Intellectual Property Collateral at a public or private sale, should default occur, and permitted XACP to purchase the Collateral at the public sale, should it wish to do so.

In December 2002, SVB assigned its security interest to XACP through a Non-Recourse Assignment, giving XACP all of the "right, title, and interest" formerly held by SVB. This Assignment was recorded with the PTO; at that point, XACP held the security interest in all of the patents-in-suit.

---

to apply for patents, patents, patent applications, and like protections . . . including without limitation the patents and patent applications set forth" in the Agreement.

[3] At all times, XACP acted as an agent for Cross Atlantic Technology Fund, L.P., The Co-Investment 2000 Fund, L.P., and 3i Technology Partners L.P. Within the Agreements, these parties are referred to as the "XACP Entities." For purposes of this Opinion, "XACP" refers to all of these entities.

Ozro defaulted on its loan obligations and XACP foreclosed on the patents. On February 18, 2003, XACP issued a foreclosure notice ("Notice") to all of Ozro's creditors, inventors, and counsel. The Notice identified the patents-in-suit as those to be sold at public auction.

In the meantime, Conklin started a new company, Whitelight Technology, later known as Sky Technologies LLC ("Sky"). Conklin entered into negotiations with XACP to transfer ownership of the patents-in-suit to Sky. On June 4, 2003, XACP and Conklin signed a Settlement Agreement stating that XACP:

> shall use [its] best efforts to obtain title to the Intellectual Property [including the patents-in-suit] for purposes of a transfer from [XACP] to [Sky] by selling all of [XACP]'s rights in and to the Secured Intellectual Property by Public Auction within sixty (60) days after the Effective Date. . . . At the Public Auction, [XACP] will credit bid up to $4,031,844 as may be required to purchase the Intellectual Property, including but not limited to the right to sue for past infringement or misappropriation of the Patents, covered by security interest held by [XACP].

> To the extent that portions of the Intellectual Property are not subject to the security interests held by [XACP] . . . [XACP] and Conklin agree to use their best efforts to acquire such assets from Ozro to be held by [Sky] without further consideration payable by Conklin or XACP.[4]

Both XACP and Jeffrey Conklin, as an individual, signed the Settlement Agreement. Conklin also signed the document as Manager of Whitelight Technology.

On July 14, 2003, XACP foreclosed on its security interests at public auction. The security interest formerly held by SVB and subsequently assigned to XACP was

---

[4]    The terms of the Settlement Agreement were previously drafted in a Term Sheet. However, the Term Sheet was never presented to the district court and, therefore, is an improper part of the appellate record. Fed. R. App. P. 10(a)(1) (stating the record on appeal contains "the original papers and exhibits filed in the district court"); see also Moore U.S.A., Inc. v. Standard Register Co., 229 F.3d 1091, 1116 (Fed. Cir. 2000) ("[T]he record on appeal is generally limited to that which is before the district court.").

sold first, and then XACP foreclosed on its own security interest. XACP was the only bidder for both sales and purchased all of the assets. On July 22, 2003, pursuant to the Settlement Agreement, XACP assigned all of its "right[s], title, and interest in" the patents-in-suit to Sky by a written assignment ("Sky Assignment"). At no point after foreclosure did Ozro execute a written agreement assigning all of its rights, title, or interests in the patents to XACP.

On October 17, 2006, Sky filed a patent infringement suit against SAP in the United States District Court for the Eastern District of Texas. On January 4, 2008, SAP moved to dismiss Sky's Complaint for lack of standing. On March 20, 2008, the district court requested supplemental briefings from the parties to discuss whether the SVB and XACP Agreements alone granted substantial rights, or whether the security agreements transferred title upon default of the debtor.

On June 4, 2008, the district court, relying on this court's opinion in <u>Akazawa</u>, held the patents-in-suit were transferred from Ozro to XACP through the July 14, 2003 foreclosure proceedings. Because XACP properly complied with the Massachusetts Uniform Commercial Code ("UCC") foreclosure requirements by placing the patent collateral up for sale at a public auction and notifying Ozro of the sale, the district court held title was transferred on July 14, 2003, the date of the foreclosure. For this reason, when XACP assigned the patents-in-suit to Sky on July 22, 2003, Sky became vested with all rights, title, and interest in the patents. Thus, the chain-of-title had not been broken from Ozro to Sky, and Sky was declared the proper title-holder of the patents-in-suit, giving Sky standing to bring the patent infringement suit.

SAP filed a Motion for Reconsideration and/or Certification of Question for Interlocutory Appeal on July 15, 2008. The district court denied the Motion for Reconsideration because SAP failed to raise any new argument or present new evidence. However, the district court found that "substantial grounds for difference of opinion exist regarding the question of whether a transfer of title through operation of law without a written assignment may apply in situations that do not involve heirs or probate law." The district court granted SAP's Motion for Certification of Question for Interlocutory Appeal. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1292(b).

## II.    DISCUSSION

### A.  Standard of Review

An Article III standing challenge is a question of law, which this court reviews de novo. Akazawa, 520 F.3d at 1355 (citing Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1376 (Fed. Cir. 2000)). As this matter is before the court on an interlocutory appeal, our jurisdiction "applies to the order certified to the court of appeals, and is not tied to the particular question formulated by the district court." Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 205 (1996) (finding that the court is limited by the certified order, but may consider all issues discussed within that order) (emphasis omitted).

### B.  Valid Transfer of Patent Title through Operation of Law

In order to seek damages for infringement of a patent, a party must have standing at the inception of the lawsuit. Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d 1574, 1579 (Fed. Cir. 1991). A party that has been granted all substantial rights under

the patent, "regardless of how the parties characterize the transaction that conveyed those rights," is considered to have legal title, and therefore standing. Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1249–50 (Fed. Cir. 2000). Thus, it is the "substance of what was granted" that determines the rights in the patent, not the form. Id. at 1250; Vaupel Textilmaschinen KG v. Meccanica Europa Italia S.P.A., 944 F.2d 870, 873–76 (Fed. Cir. 1991). In the present case, the central question is whether XACP had legal right, title, and interest in the patents-in-suit to transfer all of those rights to Sky, thereby providing Sky with standing to bring the underlying infringement claim. Appellants contend that because no writing exists transferring the patents-in-suit to XACP, Sky did not obtain legal title from XACP, and therefore does not have standing in this matter. Appellee disagrees, and argues that Akazawa permits transfers of patent ownership by operation of law without a writing, and because the patents-in-suit were foreclosed upon in accordance with Massachusetts law, XACP became the owner of the patents on July 14, 2003, after the foreclosure proceedings. Accordingly, Appellee contends that XACP's assignment to Sky vested Sky with full legal title and standing in the underlying case. We agree.

### 1. Akazawa Controls

We have previously held that patent ownership is determined by state, not federal law. Akazawa, 520 F.3d at 1357 (citing Jim Arnold Corp. v. Hydrotech Sys., Inc., 109 F.3d 1567, 1572 (Fed. Cir. 1997) ("[T]he question of who owns the patent rights and on what terms typically is a question exclusively for state courts.")). However, "the question of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of

standing in patent cases," and therefore we have "treated it as a matter of federal law." DDB Techs., L.L.C. v. MLB Advanced Media, L.P., 517 F.3d 1284, 1290 (Fed. Cir. 2008). Usually, federal law is used to determine the validity and terms of an assignment, but state law controls any transfer of patent ownership by operation of law not deemed an assignment.

The Federal Patent Act requires that all assignments of patent interest be in writing. 35 U.S.C. § 261 (2006). This requirement dates back to the 1881 Supreme Court decision in Ager v. Murray, which held that a debtor's interest in a patent that would be used to satisfy a judgment against him was property, "assignable by him, and . . . [could not] be taken on execution at law." 105 U.S. 126, 131–32 (1881). The Court held that the patentee was required to execute a writing to assign title, or a trustee would be appointed to execute an assignment, "if the patentee should not himself execute one as directed." Id. at 126, 132. This decision was based on the idea that a creditor cannot reach incorporeal property, such as a patent, due to its intangible nature; the transfer (either voluntary or involuntary) to a purchaser must be done by written assignment "in order to vest [the purchaser] with a complete title to the property." Id. at 130 (citing Stephens v. Cady, 55 U.S. (14 How.) 528, 531 (1852)).

Even though a transfer of patent ownership, if through an assignment, must be in writing, this court has held, "[T]here is nothing that limits assignment as the only means for transferring patent ownership. . . . [O]wnership of a patent may be changed by operation of law." Akazawa, 520 F.3d at 1356. In Akazawa, the defendant challenged the plaintiff's standing to sue for infringement based on an alleged defect in the assignor's claim of ownership in the patent. Id. at 1355. Akazawa, the inventor of a

patent, died intestate, after which his wife and daughters agreed that all of Akazawa's rights would be transferred to his wife, who then transferred her rights to the plaintiff. Id. at 1355. The district court held that the plaintiff lacked standing to enforce the patent because no writing had been issued from the inventor to his wife granting her all of his rights to the patent. Id. We reversed the district court's decision and held that passage of title through intestacy is not an assignment, and therefore did not require a writing. Id. at 1358. Further, we stated that if the controlling state or foreign intestacy law passed title of the patent to the wife and daughters upon the inventor's death, then all subsequent transfers were valid. Id.

We find that Akazawa controls in the instant case, and that the district court's reliance on its reasoning was appropriate because transfer of patent ownership by operation of law is permissible without a writing. Akazawa says nothing about permitting assignments without a writing; rather, this court made it clear that if assignment is the method of transfer of patent ownership, it must be done in writing, pursuant to § 261. See Akazawa, 520 F.3d at 1356. However, assignment is not the only method by which to transfer patent ownership. As noted below, foreclosure under state law may transfer patent ownership. Here, XACP's foreclosure on its security interest was in accordance with Massachusetts law; therefore, Sky received full title and ownership of the patents from XACP providing it with standing in the underlying case.

2. Transfer of Title under Massachusetts Law

In the instant case the controlling state law is the Massachusetts UCC. Massachusetts UCC § 9-610 permits a secured party to sell the collateral after default, in a commercially reasonable manner, and that same party may purchase the collateral

at a public disposition.  Section 9-617 of the UCC states that once a secured party disposes of collateral after default, the transferee for value takes all of the debtor's rights in the collateral.  Mass. Gen. Laws ch. 106, § 9-617(a)(1) (2009).  Because XACP foreclosed on the patents-in-suit in conformity with these provisions, XACP obtained title to the patents on July 14, 2003.

In the XACP Security Agreement, Ozro gave XACP a security interest in the patents-in-suit as collateral security.  Upon default, XACP could exercise all rights pursuant to the Massachusetts UCC and "sell, lease, or otherwise dispose" of the Collateral.  The XACP Agreement also contained a provision dictating the sale of the Collateral, including a clause permitting XACP to purchase the Collateral at a public sale.  In accordance with the Security Agreement and the Massachusetts UCC, XACP gave Ozro at least seven days' notice of the sale, disposed of the Collateral through a public auction, and purchased the Collateral at the same auction.  Therefore, consistent with sections 9-610 and 9-617, XACP received all of Ozro's rights in the Collateral, making XACP the title-holder of the patents-in-suit after foreclosure.

Despite this clear authority, Appellants make much of 35 U.S.C. § 154, which controls the content and term of a patent.  Section 154(a)(1) states, "Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention . . . ."  35 U.S.C. § 154(a)(1) (2006).  Accordingly, Appellants contend that patents can only be owned by three categories of individuals—the patentee, his heirs, or his assigns.  Appellants assert the holding in <u>Akazawa</u> was correct, but is not controlling because the class of persons receiving ownership through operation of law in

<u>Akazawa</u> were heirs—a class within § 154(a)(1)—but no heirs or assigns exist in the present case. We find this argument unpersuasive. Section 154 does not restrict patent ownership to these three classes of individuals, and moreover, this language fails to specifically address <u>transfers</u> of patent ownership.

Appellants also claim that, regardless of sections 9-610 and 9-617, a writing requirement exists in the Massachusetts UCC. To find such a requirement, Appellants suggest section 9-619 requires a writing where there is a transfer of any patent collateral, whether the transfer is by assignment or operation of law. We find this argument lacking. Section 9-619 permits parties to prepare a Transfer Statement, which creates "a simple mechanism for obtaining record or legal title, for use primarily when other law does not provide one." Mass. Gen. Laws ch. 106, § 9-619 cmt. 2 (2009). This document "entitles the transferee to . . . all rights of the debtor in the collateral." <u>Id.</u> § 9-619(b). According to comment two in section 9-619, the purpose of a Transfer Statement is to make title clear in circumstances where title is transferred to a third party after a secured party has exercised its rights, and to provide potential buyers of collateral subject to a registration system a writing reflecting ownership. Nothing in the language of section 9-619 evinces the requirement that a writing must exist to transfer patent rights through operation of law, only that such a writing is recognized under the Massachusetts UCC. Based on the plain language of the provision, such a writing is permissible, not mandatory.

C. No Preemption of State Law

Appellants claim if Massachusetts law is found to allow transfers of patent ownership without a writing, then federal preemption must occur pursuant to 35 U.S.C.

§ 261; however, Appellants are incorrect. Section 261 speaks only to assignments of patents; there exists no federal statute requiring a writing for all conveyances of patent ownership. Therefore, no federal law preempts the use of the Massachusetts UCC foreclosure provisions to transfer patent ownership by operation of law. Consequently, Appellants' preemption argument lacks merit.

D. Public Policy Justifications

The policy justifications for permitting transfers of patent ownership through operation of law without a writing also support our holding. First, if foreclosure on security interests secured by patent collateral could not transfer ownership to the secured creditor, a large number of patent titles presently subject to security interests may be invalidated. Any secured creditor who maintained an interest in patent collateral would be in danger of losing its rights in such collateral. Second, by restricting transfer of patent ownership only to assignments, the value of patents could significantly diminish because patent owners would be limited in their ability to use patents as collateral or pledged security. Lastly, it would be impractical to require secured parties to seek out written assignments following foreclosure from businesses that may have ceased to exist.

We need not address the pre- or post-default documents submitted by Appellee to determine if a writing exists which transferred title to XACP. By following proper foreclosure procedures, XACP became the owner of the patents-in-suit. Therefore, XACP's assignment to Sky of all of its rights, title, and interest in the patents-in-suit made Sky the owner of the same, and the proper party to bring the underlying infringement action.

### III.  CONCLUSION

For the aforementioned reasons, we affirm.

<u>AFFIRMED</u>

### IV.  COSTS

No costs.