# United States Court of Appeals for the Federal Circuit

---

A&D AUTO SALES, INC., ALLEY'S OF KINGSPORT, INC., ARCHER CHRYSLER JEEP WEST, INC., ARCHER CHRYSLER PLYMOUTH, INC., ARCHER DODGE, INC., ARCHER FINANCIAL HOLDINGS, INC., AXELROD CHRYSLER DODGE JEEP, INC., AXELROD CHRYSLER, INC., BARRY DODGE INC., BENNETT AUTOPLEX INC., BENSON MOTOR INC., ARROW FORD, INC., BILL KAY SUZUKI, INC., BOARDWALK AUTO CENTER, INC., BOB LUEGERS MOTORS, INC., BOB ROHRMAN MOTORS, INC., BOB TAYLOR JEEP, INC., BONDY'S FORD, INC., BROTHER'S MOTORS, INC., BURKE AUTOMOTIVE GROUP, INC., BY FISHEL'S JEEPS, INC., CARDENAS MOTORS, INC., CARSON AUTOMOTIVE INC., CDOHY, INC., CARSON CJ, LLC, CENTURY DODGE, INC., CHILSON, INC., CLARKSTON MOTORS, INC., COLEMAN AUTO GROUP, INC., COLEMAN CHRYSLER JEEP, INC., COUNTRY MOTORS, INC., CRAIN CDJ, LLC, CUNNINGHAM CHRYSLER JEEP, INC., CURFIN INVESTMENTS, INC., DJ-MACK INC., DET AUTOMOTIVE GROUP, INC., DAVE CROFT MOTORS, INC., BURKE BROTHERS, INC., DODGE OF ENGLEWOOD, INC., DON DRENNEN CHRYSLER JEEP, INC., DON PHILLIPS & SON SR. ENTERPRISES, INC., DONATO & SON'S JEEP, INC., DOUGLAS AUTOMOTIVE GROUP, INC., EJE, INC., EL DORADO MOTORS, INC., ELHART DODGE, INC., ELHART PONTIAC-GMC TRUCK, INC., ERTLEY CHRYSLER JEEP DODGE, LLC., FITZGERALD AUTO MALLS, INC., FT AUTOMOTIVE II, LLC, FT AUTOMOTIVE IV, LLC,

**FORT MORGANAUTO CENTER, INC., FOX HILLS MOTOR SALES, INC., G.K. ALCOMBRACK, INC., GOLDEN MOTORS, INC., GRAYSON PONTIAC, INC., GRESHAM CHRYSLER JEEP, INC., GRUBBS NISSAN MID-CITIES LIMITED, HAHN MOTOR COMPANY, HAMILTON CHRYSLER, INC., HARVEY M. HARPER CO., HOOVER MOTORS HOLDING CO., INC., HOOVER DODGE, INC., I.M. JARRETT & SON, INC., ISLAND JEEP, INC., JAMES W. HALTERMAN, INC., JIM MARSH AMERICAN CORPORATION, JOHN CULLEN DODGE, LLC, JOHNSON COUNTY MOTORS, L.C., KINGSTON DODGE, INC., KITAGAWA MOTORS, INC., KOVATCH FORD, INC., LFCJ, INC., LEE PETERSON MOTORS, INC., LENIHAN JEEP, INC., LIVONIA CHRYSLER JEEP, INC., LOU BACHRODT CHEVROLET, INC., MANCARI'S OF ORLAND HILLS, INC., MARKETPLACE SUZUKI, INC., MARSTALLER MOTORS, INC., MELCHIORRE, INC., MILLER-CAMPBELL COMPANY, MILLER MOTOR CAR CORPORATION, MILNER O'QUINN CHRYSLER DODGE JEEP, INC., MORONG BRUNSWICK, NEIL HUFFMAN ENTERPRISES, INC., NEIL HUFFMAN, INC., LUNT MOTOR COMPANY, MANUEL DODGE, INC., MATT MONTGOMERY, INC., MATTHEWS CHRYSLER, INC., MT. CLEMENS DODGE, INC., NEW CITY AUTO SALES, INC., NORTHGLENN DODGE, INC., JEFF HUNTER MOTORS, INC., JELMAC LLC, PAINTER SALES AND LEASING, PAINTER'S SUN COUNTRY CHRYSLER, INC., PEN MOTORS, INC., PLEASANT VALLEY MOTORS, INC., PRESTON CHRYSLER JEEP, INC., PRIDE CHRYSLER JEEP, INC., QUALITY JEEP-CHRYSLER, INC., RFJS COMPANY, LLC, REUTHER DODGE LLC, REUTHER'S INVESTMENT COMPANY, RHODEN AUTO CENTER, INC., RICHARD CHRYSLER JEEP, INC., RIVERSIDE AUTO SALES OF MARQUETTE,**

INC., ROCK OF TEXAS AUTOMOTIVE, INC., ROHR-ALPHA MOTORS, INC., SCK, INC., SCOTIA MOTORS, INC., SCOTT CHEVROLET, INC., SHOEMAKER AUTO GROUP, INC., SIEMANS IMPORTS, INC., SOUTH SHORE AUTO LINES, INC., SOUTHEAST AUTOMOTIVE, INC., STAR CHRYSLER, INC., TAMAROFF 12 MILE MOTORS, INC., TARBOX CHRYSLER JEEP, LLC, TARBOX MOTORS INC., TAYLOR & SONS, INC., TED BRITT OF FREDERICKSBURG, INC., TENAFLY CHRYSLER JEEP, INC., TETON MOTORS, INC., THOMAS SALES & SERVICE, INC., TOMSIC MOTOR COMPANY, TRANSIT LLC, TRI-STATE AUTOMOTIVE ASSOCIATES, INC., THE UNION SALES COMPANY, URKA AUTO CENTER, INC., VALLEY DODGE, INC., VERONA MOTOR SALES, INC., VIC OSMAN LINCOLN-MERCURY, INC., VILLAGE CHRYSLER JEEP, INC., WACO DODGE SALES, INC., WALKER MOTORS, INC., WALLACE CHRYSLER JEEP, LLC, WESTMINSTER DODGE, INC., WESTSIDE DODGE, INC., WHEATON MOTOR CITY, INC., WHEELER LEASING CO. II, INC., WHITEY'S, INC., WILLIAM T. PRITCHARD, INC., WRIGHT DODGE, LLC, WYCKOFF CHRYSLER, INC., AND YOUNG VOLKSWAGEN, INC.,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

————————————————

2013-5019

————————————————

Appeal from the United States Court of Federal Claims in No. 11-CV-0100, Senior Judge Robert H. Hodges, Jr.

--------------------------------------------------------

**COLONIAL CHEVROLET CO., INC., AND MIKE FINNIN MOTORS, INC.,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

_____

2013-5020

_____

Appeal from the United States Court of Federal Claims in No. 10-CV-0647, Senior Judge Robert H. Hodges, Jr.

_____

Decided: April 7, 2014

_____

ROGER J. MARZULLA, Marzulla Law, LLC, of Washington, DC, argued for plaintiffs-appellees in case no. 2013-5019. With him on the brief were NANCIE G. MARZULLA. Of counsel on the brief was LEONARD A. BELLAVIA, Bellavia Gentile & Associates, LLP, of Mineola, New York.

HARRY ZANVILLE, Law Office of Harry Zanville, San Diego, California, argued for plaintiffs-appellees in case no. 2013-5020. With him on the brief were STEVEN J. EAGLE, Law Office of Steven J. Eagle, of Arlington, Virginia, RICHARD D. FAULKNER, JAMES D. BLUME, Blume, Faulkner Skeen & Northam, PPLC, of Richardson, Texas,

and G. KEVIN BUCHANAN, Buchanan & Bellan, L.L.P., of Dallas, Texas.

KENNETH M. DINTZER, Assistant Director, Civil Division, Commercial Litigation Branch, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were STUART F. DELERY, Principal Deputy Assistant Attorney General, JEANNE E. DAVIDSON, Director, DAVID A. HARRINGTON, and ELIZABETH M. HOSFORD, Senior Trial Counsels, and SARAH M. VALENTI and SETH W. GREENE, Trial Attorneys. Of counsel were DANIEL B. VOLK, and SARAH M. BIENKOWSKI, Attorneys.

JONATHAN A. MICHAELS, Michaels Law Group, APLC, of Newport Beach, California, for amici curiae, Spitzer Motor City, et al. With him on the brief was KATHRYN J. HARVEY. Of counsel on the brief was ALLEN P. PRESS, Green Jacobson, P.C., of Clayton, Missouri.

_____

Before NEWMAN, DYK, and TARANTO, *Circuit Judges*.

DYK, *Circuit Judge*.

These appeals arise from two takings suits related to the 2009 bankruptcies of General Motors Corporation ("GM") and Chrysler LLC ("Chrysler"). The plaintiffs are former dealers of those companies whose franchises were terminated in the bankruptcies. The plaintiffs allege that these terminations constituted a taking because the government required them as a condition of its providing financial assistance to GM and Chrysler and/or to the companies that succeeded them in the bankruptcies. The government moved to dismiss the suits for failure to state a claim. The United States Court of Federal Claims ("Claims Court") denied dismissal, and the government brought these interlocutory appeals.

Because we lack the benefit of a fully developed factual record, we do not at this stage address every issue the government raises. As to the issues we do address, we reject the government's arguments for dismissal. While we hold that the complaints are deficient because they do not sufficiently allege that the economic value of the plaintiffs' franchises was reduced or eliminated as a result of the government's actions, we nonetheless affirm the Claims Court's decision to deny dismissal at this point in the proceedings. The proper remedy is to grant the plaintiffs leave to amend their complaints to include the necessary allegations, and on remand the Claims Court shall do so.

## BACKGROUND

At this stage in the proceedings, we accept the dealers' well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While we primarily consider the allegations in the complaint, we may also look to "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004).

## I

The bankruptcies of GM and Chrysler took place in the historic recession and credit crisis of 2008–09. GM and Chrysler were in serious financial difficulty, as loans to automobile dealers and consumers had come to an "abrupt halt" and sales "plummeted." A&D J.A. 78.[1]

---

[1]    This opinion refers to the joint appendix in No. 2013-5019, *A&D Auto Sales, Inc. v. United States*, as the "A&D J.A." The joint appendix in No. 2013-5020, *Colonial Chevrolet Co. v. United States*, is referred to as the "Colo-

Automobile sales were down more than 37% from the previous year, falling to their lowest level in 26 years. In a major public speech, President Bush expressed fears that "[i]f we were to allow the free market to take its course now, it would almost certainly lead to disorderly bankruptcy and liquidation for the automakers." President George W. Bush, President Bush Discusses Administration's Plan to Assist Automakers (Dec. 19, 2008) (transcript available at http://georgewbush-whitehouse.archives.gov/news/releases/2008/12/20081219.html). In late 2008, the chief executives of GM and Chrysler appeared before Congress to ask for emergency financial assistance in the form of loans and lines of credit. Shortly thereafter, Treasury Secretary Henry Paulson created the Automotive Industry Financing Program, through which the Department of Treasury ("Treasury") would make loans and other investments in the automakers using government funds. As the plaintiffs agree, the stated goal of the program was to avoid "disorderly bankruptcy and liquidation," which would entirely eliminate them as ongoing entities. *Id.* The program was created as a part of the wider Troubled Asset Relief Program ("TARP"), which made similar investments in a number of financial institutions. TARP had been established by Congress two months earlier, in the Emergency Economic Stabilization Act of 2008, Pub. L. 110-343, 122 Stat. 3765.

The government's first assistance to the automakers consisted of stopgap loans ($13.4 billion to GM, $4 billion to Chrysler) intended to keep the companies from having to cease operations pending talks over more comprehensive assistance. In connection with these loans, the government and the automakers entered formal agreements

---

nial J.A." The government's briefs are referred to as "Gov't's A&D Br." and "Gov't's Colonial Br."

setting forth the conditions of the government's assistance. One condition was that the companies would submit viability plans demonstrating that they could achieve financial stability with the help of the government funds. GM and Chrysler submitted their viability plans in February 2009 as required.

The government rejected GM and Chrysler's initial viability plans and called for the submission of revised proposals. Executive branch officials in charge of overseeing the financial assistance suggested that the companies adopt various changes to improve their long-term viability, such as focusing on lighter, more fuel-efficient vehicles and (in GM's case) more quickly reducing the number of brands. The government specifically suggested that the automakers should significantly reduce the number of dealers within their franchise networks to improve their viability. Although the automakers were already reducing their dealer ranks over time and GM's initial viability plan had included additional dealer terminations, the government determined that the current and proposed pace of terminations was too slow, and that the companies' large dealer networks were an obstacle to viability. The government advised the companies they should expand their terminations and that they might accomplish the terminations expeditiously by opting to reject the franchise agreements in bankruptcy proceedings.[2]

---

[2]    Two provisions of the Bankruptcy Code are central to the bankruptcies at issue. 11 U.S.C. § 363 authorizes certain sales of a debtor's assets. And 11 U.S.C. § 365 provides that a bankruptcy trustee "may assume or reject any executory contract or unexpired lease of the debtor." Debtors-in-possession in chapter 11 bankruptcies, like GM and Chrysler, generally have a trustee's powers. 11 U.S.C. § 1107.

Outside bankruptcy, the dealer franchises had protections against termination under various state and federal franchise laws. The complaints allege that the government's proposals concerning franchise terminations were mandatory—that is, that the government required the automakers to include them or else forgo any further financial assistance. At this stage, we accept the plaintiffs' allegations as true, and proceed on the assumption that the government required these terms as a condition of financial assistance.

The companies eventually adopted the government's suggestions for a bankruptcy filing, reduction of their dealer networks, and other changes. Each filed for Chapter 11 reorganization, and the government made available an additional $38 billion in financing ($30 billion in loans and equity investments to GM, $8 billion in loans to Chrysler) for restructuring the companies. After approval by the bankruptcy court under 11 U.S.C. § 363, the old GM and Chrysler entities sold most of their operating assets to newly created entities commonly called "New GM" and "New Chrysler"—in which the federal government, and other entities, acquired specified ownership interests. As a result of the sale, the government acquired a 60.8% ownership stake in New GM's common stock, as well as a portion of its preferred stock. The dealer franchises that were not terminated were transferred to the new entities along with other assets. The termination of the remaining franchises was handled differently by each company. In Chrysler's case, the franchises were eventually terminated by the bankruptcy estate. In GM's case, either the franchises were terminated by the bankruptcy estate or the dealers signed "Deferred Termination Agreements" providing for a transition to termination. To the extent the franchises were terminated by action of the bankruptcy estate, the affected dealers received unsecured claims against the estates, *see* 11 U.S.C. § 365(g); *In re Old Carco LLC*, 406 B.R. 180, 190 (Bankr. S.D.N.Y.

2009), but it is unclear whether they have received anything for those claims. It is unclear as well whether the dealers who signed termination agreements received any compensation.

## II

The first of these two suits was filed in September 2010 by several terminated GM and Chrysler dealers. Suing on behalf of themselves and a putative class of others similarly situated, the plaintiffs alleged that the government had effected a taking of their dealer franchises (including rights conferred by state law) by "coerci[ng]" the automakers—that is, by requiring dealer terminations as a condition of financial assistance. Colonial J.A. 29; *see also* A&D J.A. 20. The plaintiffs alleged that this constituted a regulatory taking. They did not allege a physical taking.[3]

---

[3]   In addition to the plaintiffs' franchise agreements, the Colonial complaint identified a handful of "distinct investment-backed expectation assets" including "real property," "enhancements to real property," "buildings," "fixtures," "specialized tools," "signage," and inventory of parts and vehicles. Colonial J.A. 32. It also identified intangible assets such as "debt collateralization and/or other specialized floor plan financing," "blue sky," and "good will." Colonial J.A. 32. The complaint did not allege a taking of those assets, however. It simply identified them as evidence of the plaintiffs' "distinct investment-backed expectation[s]" in their dealership franchises. Colonial J.A. 32.

    The complaint also identified two government actions (aside from the alleged requirement of dealer terminations in exchange for financing) that were alleged to be takings: (1) the actions of the bankruptcy court that

In February 2011, a separate group of former Chrysler dealers brought a second suit in the Claims Court. The two complaints were largely identical in substance.

Both cases were assigned to the same judge of the Claims Court. Shortly after amended complaints were filed, the government moved pursuant to Claims Court Rule 12(b)(6) to dismiss each complaint for failure to state a claim.[4] The Claims Court denied both motions, issuing an identical order in each case. The Claims Court concluded that the plaintiffs' allegations were sufficient to make out a prima facie takings claim. The court noted that it was "not aware of a takings theory that resembles the legal and factual theories offered so far" and that the plaintiffs' "unusual allegations" did "not fit neatly into a normal takings framework." Colonial J.A. 4; A&D J.A. 4. Nonetheless, the court found that the "[p]laintiffs should have the opportunity to develop [their] case[s]." Colonial J.A. 6; A&D J.A. 6. The court reasoned that the possibility that the plaintiffs could prevail "demand[ed] rejection of [the government's] motion to dismiss on the pleadings as premature." Colonial J.A. 6; A&D J.A. 6.

After the Claims Court denied dismissal, the government moved the court to certify an interlocutory appeal under 28 U.S.C. § 1292(d)(2). The government asked the

---

approved the terminations, and (2) a federal law that allowed terminated dealers to seek reinstatement through arbitration. Each government action was alleged to be a taking independent of the others. However, the plaintiffs later dismissed these claims.

[4]    The government also moved to dismiss for lack of subject matter jurisdiction. It is not clear that the government presses that issue on appeal. In any event, we see no lack of subject matter jurisdiction in the Claims Court.

Claims Court to certify two questions: whether the complaints failed to state a claim upon which relief could be granted, and whether bankruptcy court findings precluded the suit. The Claims Court certified the first question only. The government then filed petitions for interlocutory appeal with this court. We granted the petitions, agreeing "that the criteria for interlocutory appeal . . . are met and that these petitions should be granted and heard on the merits by this court." Order Granting Petitions for Interlocutory Appeal 6, November 30, 2012, ECF No. 2-3. We review the denial of the government's motions to dismiss de novo. *See, e.g.*, *First Med. Health Plan, Inc. v. Vega-Ramos*, 479 F.3d 46, 50–51 (1st Cir. 2007) (on interlocutory appeal, denial of motion to dismiss is reviewed de novo).

## DISCUSSION

### I

We address initially the scope of our review in this case. Our appellate jurisdiction is ordinarily limited to the Claims Court's final decisions. *See* 28 U.S.C. § 1295(a)(3). But our jurisdiction extends to certain interlocutory orders as well pursuant to § 1292(d)(2). In interlocutory appeals, the scope of the issues is "limited to the order appealed from, but not to the specific stated question" articulated by the Claims Court. 16 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3929, at 454 (3d ed. 2012). We may consider "any question reasonably bound up with the certified order, whether it is antecedent to, broader or narrower than, or different from the question specified by the [Claims Court]." *Id.* at 457; *see Sky Techs. LLC v. SAP AG*, 576 F.3d 1374, 1378–79 (Fed. Cir. 2009); *United States v. Connolly*, 716 F.2d 882, 884–85 (Fed. Cir. 1983). But we are not obligated to decide all questions presented by the order. *See* Wright, Miller, & Cooper, *supra*, at 448 (noting that courts of appeals have discretion to vacate an

initial grant of permission to appeal). That is particularly so in cases where "an underdeveloped record may lead to ill-informed decision of an important question." *Id.* at 450–51.

The facts of this case are unique and raise issues that have not been decided before, and the record at this stage consists of little more than the plaintiffs' allegations. As discussed below, we decline to address some questions asked at this preliminary stage without the benefit of a full factual record. But we conclude that other issues are ripe for decision.

## II

The Takings Clause of the Fifth Amendment guarantees just compensation whenever private property is "taken" for public use. U.S. Const. amend. V. The plaintiffs do not allege, and their complaints do not assert facts supporting an allegation of, a "direct government appropriation or physical invasion of [their] private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005); *see, e.g.*, *United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) (seizure and operation of private coal mine); *United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945) (occupation of private warehouse). Nor do they allege, or support an allegation, that the government stepped into the shoes of the dealers by assuming their contractual rights or transferring them to a third party.[5]

Government action that does not directly appropriate or invade, physically destroy, or oust an owner from

---

[5]    In that sense, this case is distinguishable from *Armstrong v. United States*, 364 U.S. 40, 46–49 (1960) and *International Paper Co. v. United States*, 284 U.S. 399, 408 (1931). To the extent the Colonial plaintiffs suggest otherwise, there is no support for such a contention.

property but is overly burdensome may be a regulatory taking. "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922); *see also Lingle*, 544 U.S. at 537 (regulation is a taking if it is "so onerous that its effect is tantamount to a direct appropriation or ouster"). The plaintiffs have alleged only regulatory takings.

The Supreme Court has treated certain regulatory actions as "categorical" takings. A categorical taking occurs where regulations "compel the property owner to suffer a physical invasion of his property" or "prohibit all economically beneficial or productive use." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) (internal quotation marks omitted). Beyond those categories, the Supreme Court has "generally eschewed any set formula, instead preferring to engage in essentially ad hoc, factual inquiries." *Id.* (internal quotation marks omitted). But three factors have "particular significance" in the analysis: (1) "the character of the governmental action," (2) "the extent to which the [action] has interfered with distinct investment-backed expectations," and (3) "[t]he economic impact of the regulation on the claimant." *Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). And of course, "the existence of a valid property interest is necessary in all takings claims." *Wyatt v. United States*, 271 F.3d 1090, 1097 (Fed. Cir. 2001).

The Supreme Court has mainly applied the categorical test to regulatory takings of real property. *See Lucas*, 505 U.S. at 1015–19. As the Claims Court recognized, other circuits view the *Lucas* test as applying only to land. *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 441 (8th Cir. 2007) ("[I]t appears that *Lucas* protects real property only."); *Unity Real Estate Co. v. Hudson*, 178 F.3d 649, 674 (3d Cir. 1999) ("[T]he categorical approach has only been used in real property cases."); *see also Lucas*, 505 U.S. at 1027–28 ("[I]n the case of personal

property, by reason of the State's traditionally high degree of control over commercial dealings, [the owner] ought to be aware of the possibility that new regulation might even render his property economically worthless . . . ."). We have applied the categorical test to personal property on occasion. *E.g.*, *Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1196–98 (Fed. Cir. 2004); *Maritrans, Inc. v. United States*, 342 F.3d 1344, 1353–55 (Fed. Cir. 2003). But those cases involved only tangible property. *Rose Acre Farms*, 373 F.3d at 1196 (chickens); *Maritrans*, 342 F.3d at 1354 (barges); *see also Brown v. Legal Found. of Wash.*, 538 U.S. 216, 220 (2003). We have not had occasion to address whether the categorical takings test applies to takings of intangible property such as contract rights. We decline to decide the issue at this stage of the litigation since the issue has not been briefed by the parties.

## A

We begin our analysis in this case with the alleged property interest, an issue equally relevant to alleged categorical takings and to takings governed by the *Penn Central* analysis. There is no dispute that the plaintiffs' franchise agreements are property for purposes of the Takings Clause. In general, "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States." *Lynch v. United States*, 292 U.S. 571, 579 (1934); *see also U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n.16 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."). Franchise agreements are no exception to this general rule.

The government argues that the plaintiffs nonetheless lack a compensable property interest. As the government points out, during the lifetime of the agreements, the law of bankruptcy has always allowed a trustee or debtor-in-

possession to reject executory contracts as GM and Chrysler did here. *See generally* 11 U.S.C. § 365(a). The government argues that this principle of bankruptcy law "inhere[d]" in the franchise agreements, and that termination of the agreements therefore did not concern a compensable property interest of the plaintiffs. Gov't's Colonial Br. 13; Gov't's A&D Br. 13.

We reject this argument. It is true that "background principles" of law may "inhere" in a plaintiff's title to his property and thereby limit his ability to recover for a taking. *Lucas*, 505 U.S. at 1029; *see also Bair v. United States*, 515 F.3d 1323, 1327–28 (Fed. Cir. 2008); *M & J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed. Cir. 1995). For example, the common law of nuisance limits uses of real property that interfere with neighbors' rights of enjoyment. *See Lucas*, 505 U.S. at 1029–30. Thus a landowner may not recover for a taking when the government forbids a use that is a nuisance at common law. *Id.* The law of nuisance inheres in the landowner's title, so there is no taking if a use restriction falls within the scope of nuisance law. *Id.*; *see also Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680–90 (1974) (no taking when innocent owner's property is subject to forfeiture due to criminal acts of lessee); *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1352–53 (Fed. Cir. 2001) (en banc).

If a challenged restriction was enacted before the property interest was acquired, the restriction may be said to inhere in the title.[6] If a challenged restriction was enacted after the plaintiff's property interest was acquired, it cannot be said to "inhere" in the plaintiff's title.

---

[6]    This is not always true with respect to land use restrictions. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 626–30 (2001).

For example, in *Bair v. United States*, we held that a law giving priority to federal government liens inhered in the title of liens owned by other parties and created after the priority statute was enacted. 515 F.3d at 1331. The exercise of the government's lien did not effect a taking because the priority law predated the plaintiffs' liens and therefore inhered in their title. *Id.* Other circuits have similarly held that a law allowing bankrupt debtors to avoid certain liens inhered in the title of subsequently created liens. *See, e.g., In re Weinstein*, 164 F.3d 677, 686 (1st Cir. 1999); *In re Thompson*, 867 F.2d 416, 422 (7th Cir. 1989). But though prospective application of such laws does not give rise to takings liability, retroactive application to existing property interests would raise "difficult and sensitive questions" of a taking. *United States v. Sec. Indus. Bank*, 459 U.S. 70, 82 (1982).

Here, the plaintiffs do not dispute that the bankruptcy law allowing trustees or debtors-in-possession to reject executory contracts predated the creation of their franchise agreements. Thus the plaintiffs could have no compensable property interest if the government action were limited to the bankruptcy court's approval of the terminations. The government's problem is the alleged government action here is not the bankruptcy court's approval of the franchise terminations (a theory that the plaintiffs have abandoned). The plaintiffs allege that the government action was requiring dealer terminations as a condition of financial assistance to the automakers. The challenged government action did not predate the acquisition of the plaintiffs' interests. The plaintiffs' franchise agreements are valid and compensable property interests.

B

We turn next to whether there has been government action sufficient to invoke a takings analysis either under *Lucas* or *Penn Central*. The question here is whether the government is liable for a taking where it offers financing

to a third party as a way of inducing or requiring action that affects or eliminates the property rights of the plaintiff. We conclude that such actions may give rise to takings liability depending on the circumstances. There is no per se rule either precluding or imposing liability when the government instigates action by a third party. But two broad principles drawn from the cases may guide the analysis.

First, in some circumstances, government action directed to a third party does not give rise to a taking if its effects on the plaintiff are merely unintended or collateral. *See generally Omnia Comm. Co. v. United States*, 261 U.S. 502, 510–11 (1923). In *Omnia*, for example, the government requisitioned a steel producer's entire output for the war effort, thereby preventing the plaintiff from exercising purchase rights it had obtained through a contract with the producer. *Id.* at 507. The Supreme Court concluded that the plaintiff's loss was merely "consequential loss or injury" resulting from the requisition, and that no compensation was due the plaintiff. *Id.* at 510. Similarly, in *T.O.F.C., Inc. v. United States*, the government appropriated real property of a bankrupt railroad, terminating the plaintiff's contractual right to operate a particular rail facility and receive the profits. 231 Ct. Cl. 182, 183 (1982). Our predecessor court held that the plaintiff's loss was merely a "consequential injur[y] which result[ed] from the exercise of lawful power." *Id.* at 192. A number of our cases have found no taking where the challenged government action was of general application and the plaintiff was but one member of an affected class of persons. *See, e.g., Palmyra Pac. Seafoods, LLC v. United States*, 561 F.3d 1361, 1365–66 (Fed. Cir. 2009); *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1379–80 (Fed. Cir. 2008); *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1216 (Fed. Cir. 2005). As the Supreme Court has explained, "A member of the class which is regulated may suffer economic losses

not shared by others. His property may lose utility and depreciate in value as a consequence of regulation. But that has never been a barrier to the exercise of the police power." *Bowles v. Willingham*, 321 U.S. 503, 518 (1944).

In summary, in the cases relied on by the government, the effect of the government action upon the plaintiff was merely collateral or unintended or the action affected a general class. Here, the complaints allege that the effect of the government action on the plaintiffs' property was neither collateral nor unintended and the action affected only Chrysler and GM dealers. The complaints allege that dealer terminations were the direct and intended result of the government's actions directed to Chrysler and GM dealers because the financing was expressly conditioned on the terminations. This case is therefore different from the cases on which the government relies.

A second principle applies where the government's action was direct and intended. In such circumstances, the government may be liable if the third party is acting as the government's agent or the government's influence over the third party was coercive rather than merely persuasive. *See Tex. State Bank v. United States*, 423 F.3d 1370, 1376–77 (Fed. Cir. 2005); *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1362–63 (Fed. Cir. 2005); *Casa de Cambio Comdiv S.A., de C.V. v. United States*, 291 F.3d 1356, 1361–62 (Fed. Cir. 2002); *B & G Enters. v. United States*, 220 F.3d 1318, 1323–25 (Fed. Cir. 2000); *Langenegger v. United States*, 756 F.2d 1565, 1572 (Fed. Cir. 1985). An agency relationship may exist where the third party is hired or granted legal authority to carry out the government's business. *See, e.g.*, *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21–23 (1940) (construction company hired to build river dikes); *Lion Raisins*, 416 F.3d at 1363–64 (quasi-public crop marketing committee authorized to set price floors for crops); *Hendler v. United States*, 952 F.2d 1364, 1378–79 (Fed. Cir. 1991) (state officials authorized to perform environmental tests on the

plaintiffs' land). Here, GM and Chrysler were not acting as agents of the government in terminating the franchise agreements.

The question of coercion is more complex. While the complaints here allege that the government coerced GM and Chrysler into terminating the franchise agreements, they do not allege that the government either by statute, regulation, or direct order required the terminations.[7] Rather, the complaints allege that the government required the terminations as a condition of financial assistance, and that that action was coercive because the automakers could not survive without the financing. The line between coercion (which may create takings liability) and persuasion (which does not create takings liability) is highly fact-specific and hardly simple to determine.

Our predecessor court found coercion in *Turney v. United States*, where the government induced the Philippines to forbid exportation of certain military equipment within its borders that the United States had unwittingly sold to the plaintiffs in a surplus auction after World War II. 126 Ct. Cl. 202, 207–08 (1953). The court found that the government had exerted unusual influence over the Philippine government's decision: "Our armed forces had

---

[7]    To the extent the A&D plaintiffs suggest in their brief that the government "command[ed]" the terminations apart from the financing arrangement, A&D Br. 33 (internal quotations marks omitted), that suggestion is unsupported by the complaint and identifies no mechanism of such "command." For example, the plaintiffs have not made allegations based on the government's ownership interests in New GM and New Chrysler, which chose the particular franchise agreements to include in their acquisitions under 11 U.S.C. § 363, leaving the rest with Old GM and Old Chrysler.

just liberated the Philippines from the Japanese. Our Government had given one hundred million dollars worth of surplus property to the Philippines . . . . When we requested that Government to place an embargo upon the exportation of any of the property, it, naturally, readily complied." *Id.* at 214. Thus, when the embargo placed "irresistible pressure" on the plaintiffs to turn the property over to the United States, it created a taking. *Id.*

In *Langenegger v. United States*, by contrast, this court concluded that the government's influence over an expropriation by the El Salvadoran government was not coercion but "friendly persuasion." 756 F.2d at 1572 (internal quotation marks omitted). Distinguishing *Turney*, we explained that

> the United States cannot be held responsible merely because its activity is that of "friendly" persuasion regarding general policy, common among allies, or when the sole benefit to the United States is the political stability of its neighbors. Diplomatic persuasion among allies is a common occurrence, and as a matter of law, cannot be deemed sufficiently irresistible to warrant a finding of [coercion], however difficult refusal may be as a practical matter.

*Id.* at 1572.

The plaintiffs have not alleged coercion flowing from an existing relationship between the government and a third party that gave the government the ability to exercise general control over the third party's action. Rather they allege monetary inducement designed to compel specific actions. The only appellate takings precedent cited to us involving monetary inducement of third party action is *B & G Enterprises v. United States*, 220 F.3d at 1318. In that case, Congress offered monetary grants to the states on the condition that they adopt laws prohibiting cigarette sales to minors. *Id.* at 1321. California

fulfilled the condition by enacting a law banning cigarette vending machines in establishments open to minors, which resulted in the loss of valuable contracts to the plaintiff, a vending machine operator. *Id.* at 1322. We held that the federal government was not liable for a taking. *Id.* at 1323. We concluded that "it was California's decision to create restrictions on the placement of tobacco vending machines, not the federal government's. Congress may have provided the bait, but California decided to bite." *Id.* at 1325. In other words, coercion was not established.

The question here is whether the automakers were coerced by the government's offer of financial assistance.[8] Unfortunately there is a paucity of information as to the relevant circumstances of the government's financial assistance to the automakers. The circumstances relevant to the issue of coercion include but are not limited to whether the government insisted on the terminations, whether the terminations would have occurred in any event absent government action, whether the government financing was essential to the companies, whether the government had any role in creating the economic circumstances alleged to give rise to coercion, and whether the government targeted the dealers for termination. Under these circumstances, we think it is premature at this stage in the case to address the issue of coercion and whether, if coercion existed, takings liability follows. In this context coercion is a necessary—but not sufficient—feature to establish takings liability.

---

[8]    For present purposes we do not distinguish the Old and New companies. If that distinction is significant, it may be explored on remand.

In declining to decide the coercion issue on the present record, we can and do reject two arguments made by the government related to the issue of coercion.

First, the bankruptcy court's findings do not estop the plaintiffs from arguing that the government coerced the automakers into action. Collateral estoppel only applies if "the issue [in the instant action] is *identical* to one decided in the first action." *In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994) (emphasis added). The issue here is whether the government coerced GM and Chrysler through a coercive offer of financial assistance. The issue before the bankruptcy court was whether New GM and New Chrysler purchased the assets of Old GM and Old Chrysler "in good faith." 11 U.S.C. § 363(m); *see In re Chrysler, LLC*, 405 B.R. 84, 108 (Bankr. S.D.N.Y. 2009); *In re Gen. Motors Corp.*, 407 B.R. 463, 494 (Bankr. S.D.N.Y. 2009). Whatever the bankruptcy court found is immaterial. Its findings on good faith are not collateral estoppel on the issue of coercion.

Second, the government action in this case was not undertaken in a simply proprietary role. Proprietary government action typically involves bargaining with private actors for the provision or procurement of goods and services; the action is deemed proprietary even though the government may enter into the contractual relationship in pursuit of a larger governmental objective. *See, e.g.*, *St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376, 1385–86 (Fed. Cir. 2008) (mortgage); *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 792–93, 798 (Fed. Cir. 1993) (airfare); *Sun Oil Co. v. United States*, 215 Ct. Cl. 716, 724 (1978) (oil and gas lease). In those cases, the government is usually subject to contractual remedies that make takings liability redundant. *See Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2002); *Sun Oil*, 215 Ct. Cl. at 770 ("[W]hen [the government] 'comes down from its position of sovereignty and enters the domain of commerce, it

submits itself to the same laws that govern individuals there.'" (quoting *Cooke v. United States*, 91 U.S. 389, 398 (1875))). Here, the government did not bargain or contract with the plaintiffs, and the plaintiffs have no ordinary commercial remedy against the government. While the proprietary action doctrine might well bar a takings claim by GM and Chrysler, which signed loan agreements defining the rights between themselves and the government, that doctrine does not appear directly relevant to a takings claim by the plaintiffs.

Yet the government's purpose in requiring the dealer terminations may still be relevant to both the categorical takings and *Penn Central* analyses, as bearing on whether the government's actions were regulatory in nature or were designed to protect the government's financial interest in repayment. The government argues that in requiring a viability plan that included dealer terminations, it acted like a commercial lender, which would have ensured likely repayment of the assistance. *See* Gov't's Colonial Br. 25 (asserting that the government's conditions were "the sort of arrangement that a private party might demand in similar circumstances"); Gov't's A&D Br. 23 (same). Concerns about securing repayment of government loans exist even in loan programs having a predominantly public purpose. *See, e.g., United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 737 (1979). To the extent the dealer terminations were designed to protect the government's investment by assuring the viability of New GM and New Chrysler and the repayment of the loans and other assistance, that purpose could be viewed as non-regulatory. But that issue has not been fully developed at this stage, and so we defer its consideration in the first instance to the Claims Court.

## C

We turn next to the alleged economic impact of the government action. In order to establish a regulatory

taking, a plaintiff must show that his property suffered a diminution in value or a deprivation of economically beneficial use. This is equally true under the categorical test of *Lucas v. South Carolina Coastal Council* and the *Penn Central* test. *Lucas*, 505 U.S. at 1015 (plaintiff must show loss of "all economically beneficial or productive use"); *Penn Cent.*, 438 U.S. at 124 (court weighs "economic impact of the regulation on the claimant"); *see also Brown*, 538 U.S. at 240 n.11 ("[J]ust compensation for a net loss of zero is zero."). We have measured the diminution in value of the plaintiff's property by "'the change, if any, in the fair market value caused by the regulatory imposition," where the alleged taking is permanent rather than temporary. *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1367 (Fed. Cir. 1999) (quoting *Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1567 (Fed. Cir. 1994)). "[I]f the regulatory action is not shown to have had a negative economic impact on the [plaintiff's] property, there is no regulatory taking." *Hendler v. United States*, 175 F.3d 1374, 1385 (Fed. Cir. 1999).

Thus, by necessity, proving economic loss requires a plaintiff to show what use or value its property would have but for the government action. We have often rejected takings claims where plaintiffs failed to make such a showing. In *Forest Properties*, for example, we rejected a takings claim because the plaintiff "failed to introduce convincing evidence to show the amount, if any, by which the value of the relevant property . . . was reduced." 177 F.3d at 1367. The plaintiff had acquired 62 acres of land, 9.4 acres of which were protected wetlands that the plaintiff was denied a permit to develop. *Id.* at 1362–63. In its takings suit, the plaintiff introduced evidence that it had lost significant profits as a result of the permit denial. *Id.* at 1367. But the plaintiff failed to produce evidence that showed "the amount by which the fair market value of the 62 acres was reduced by the denial of the permit," and so we concluded there was insufficient

evidence of a taking. *Id.* Similarly, in *Seiber v. United States*, we found no temporary taking where the plaintiffs failed to show the economic impact of a delay in approval of a logging permit. 364 F.3d 1356, 1371–72 (Fed. Cir. 2004). Thus, a showing of but-for economic use or value is a necessary element of a regulatory takings claim.

Since there can be no regulatory taking without a showing of but-for decline in value, a takings plaintiff must also allege sufficient facts in its complaint to show what use or value its property would have had. The Claims Court rules require "a short and plain statement of the claim showing that the pleader is entitled to relief." R. Ct. Fed. Cl. 8(a)(2). This means the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Id.* If the plaintiff fails to include such allegations in his complaint, it is deficient.

In an analogous case, the Supreme Court found a securities fraud complaint deficient because it only alleged that the plaintiffs paid "artificially inflated purchase prices" for the defendant's stock. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (internal quotation marks omitted). As a matter of securities law, the Court concluded that inflated purchase prices were not per se economic losses. *Id.* at 342. The Court, applying general requirements for pleading, held that the complaint was deficient—it only stated that the plaintiffs purchased stock at an inflated price, not that a later price drop caused them economic loss. *Id.* at 346–48. The Court drew a direct link between the substantive law and the sufficiency of the complaint: "Our holding about plaintiffs' need to *prove* proximate causation and economic loss leads us also to conclude that the plaintiffs' complaint

here failed adequately to *allege* these requirements." *Id.* at 346 (emphasis in original).

In this case, the government argues that the plaintiffs have failed to sufficiently plead economic loss, and that in reality the franchise agreements were worthless absent the government's financial assistance to the automakers. We agree that the plaintiff's allegations are insufficient. The complaints contain no allegations regarding the but-for economic loss of value of the plaintiffs' franchises from which to establish an economic loss. Absent an allegation that GM and Chrysler would have avoided bankruptcy but for the government's intervention and that the franchises would have had value in that scenario, or that such bankruptcies would have preserved some value for the plaintiffs' franchises, the terminations actually had no net negative economic impact on the plaintiffs because their franchises would have lost all value regardless of the government action. Having failed to include such allegations, the dealers fail to satisfy the pleading standards necessary to survive a motion to dismiss.

However, we must disagree with the government that the proper remedy is to dismiss the complaints. The proper remedy is rather to grant the plaintiffs leave to amend their complaints. The Claims Court rules liberally provide for amendments of the complaint after the filing of the defendant's answer. *See* R. Ct. Fed. Cl. 15(a)(2) ("[A] party may amend its pleadings [before trial] only with the opposing party's written consent or the court's leave. The court should freely grant leave when justice so requires."). Interpreting an analogous provision of the Federal Rules of Civil Procedure, the Supreme Court explained that this mechanism should be liberally allowed:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure

> to cure deficiencies by amendments previously al-
> lowed, undue prejudice to the opposing party by
> virtue of allowance of the amendment, futility of
> amendment, etc.—the leave sought should, as the
> rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962) (quoting Fed. R. Civ. P. 15(a)).

We think those principles support a grant of leave to amend in this case. The plaintiffs have failed to properly allege economic loss, but at oral argument in this court they disputed the government's assertion that the franchises were valueless and made clear that they intended to establish loss of value. In this situation the appropriate remedy is to grant leave to amend to include specific allegations establishing loss of value. Of course it would not be sufficient to include conclusory loss of value allegations. *See Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting *Twombly*, 550 U.S. at 555)).

## D

Finally, the "distinct investment-backed expectations" of the plaintiffs are a factor of the *Penn Central* analysis that the parties have not addressed. *See* 438 U.S. at 124. Subsequent cases have clarified that "to support a claim for a regulatory taking, an investment-backed expectation must be reasonable." *Cienega Gardens v. United States*, 331 F.3d 1319, 1346 (Fed. Cir. 2003) (internal quotation marks omitted); *see Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (stating that "reasonable invest-ment-backed expectations" are one factor in the takings analysis). Assessing the reasonableness of a plaintiff's expectations "is an objective, but fact-specific inquiry into what, under all the circumstances, the [plaintiff] should have anticipated." *Cienega Gardens*, 331 F.3d at 1346; *see id.* at 1348–53 (engaging in extensive analysis of whether

"a reasonable developer in the [plaintiff's] circumstances" would have held the same expectations).

While the parties do not address this factor in this appeal, it will necessarily be a feature of the Claims Court's analysis under *Penn Central*. The Claims Court should engage in "an objective, but fact-specific inquiry," *id.* at 1346, into the reasonableness of the plaintiffs' expectation that their franchise agreements would be continued absent government action. We express no opinion on the proper analysis of this factor. It will be up to the Claims Court to weigh the reasonableness of the plaintiffs' expectations in the first instance.

## CONCLUSION

We conclude that the Claims Court properly declined to dismiss the plaintiffs' complaints at this preliminary stage. While the plaintiffs' allegations of economic loss are deficient in their present form, the deficiencies may be cured, and the Claims Court is instructed to grant the plaintiffs leave to make such curative amendments as may be necessary. Further proceedings must be consistent with this opinion.

## REMANDED

### COSTS

No costs.