# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| IBM Corporation | ) ASBCA No. 60332 |
| | ) |
| Under Contract No. W91QUZ-04-D-0003 | ) |

APPEARANCES FOR THE APPELLANT:    David W. Burgett, Esq.
Brendan M. Lill, Esq.
Nicole D. Picard, Esq.
  Hogan Lovells US LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Raymond M. Saunders, Esq.
  Army Chief Trial Attorney
Frank A. March, Esq.
  Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE WOODROW ON APPELLANT'S MOTIONS FOR SUMMARY JUDGMENT AND DISMISSAL

In 2003, the United States Army Contracting Command Agency (Army or government) awarded Indefinite-Delivery/Indefinite-Quantity (IDIQ) Contract No. W91QUZ-04-D-0003 to IBM Corporation (appellant or IBM) for worldwide information technology (IT) services. In 2003, the Army issued Task Order 0002 (TO 2) for IT support at the National Defense University at Fort McNair in Washington, DC. This appeal arises out of a contracting officer's final decision (COFD) asserting a government claim for $5,903,353 in alleged overcharges by IBM under TO 2, based on IBM's alleged failure to perform the requirements of TO 2.

Appellant's brief contains three distinct motions: (1) a partial motion to dismiss for lack of jurisdiction; (2) a motion for summary judgment on the basis that the government's claim is time-barred by the six-year statute of limitation set forth in the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109; and (3) a motion to dismiss the government's complaint with prejudice for failure to state a claim upon which relief can be granted.

We address each of appellant's motions separately.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

1. On 22 October 2003, the Army Contracting Command Agency-ITEC4 (Army or government) awarded IDIQ Contract No. W91QUZ-04-D-0003 (the contract) to IBM for IT services worldwide. With options, the contract period was from 22 October 2003 until 21 October 2010. (R4, tab 1 at 1)

2. On 30 June 2005, the Army awarded TO 2 to IBM for IT support at the National Defense University (NDU) (R4, tab 12 at 2). The task order included a base period of performance of 1 July 2005 through 1 July 2006, as well as two 12-month option periods, 1 July 2006 to 30 June 2007 and 1 July 2007 to 30 June 2008 (*id.* at 1, 5-17). The period of performance was extended to 2 September 2008 by Modification No. 27 (R4, tab 19).

3. TO 2's Performance Work Statement (PWS) provides: "The Contractor shall operate and maintain baseline services and infrastructure in accordance with Appendix C" (R4, tab 12 at 22). Appendix C consists of a table entitled "Operate and Maintain Baseline Services and Infrastructure." Below is an excerpt of the portion of the table relevant to the present motions.

| Desired Function | Required Service | Performance Standard and AQL | Monitoring Methods That May Be Used | Results for Not Meeting Performance Standards |
|---|---|---|---|---|
| Establish and administer IT security program | 1) Create, maintain and update required NDU IA policy and procedures mandated by DOD regulations and federal laws | 1) Ensure security documentation complies with Federal legislation... | 1) Monthly certified review of security documentation | 0.5% of total monthly price shall be deducted for documented deficiencies noted in Monthly reviews for identified monitor activities and not corrected within 30 days. |
|  | 2) Review audit logs and monitor network security tools | 2) Respond to security breaches within 4 hours of notification | 2) Review network security reports and logs |  |
|  | 3) Establish and monitor University software patch program | 3) Ensure that systems have latest security patches installed within 24 hours of approved release; | 3) Review patch documentation reports and logs |  |
|  | 4) Analyze network and web activity data to identify possible problem trends and propose proactive solutions | 4) Provide monthly network metric reports to include but limited to: network, server and services downtime; | 4) Review IA related help tickets |  |

2

| | | | | |
|---|---|---|---|---|
| | 5) Create and oversee a security training and awareness program | 5) Provide IA training to faculty, staff and students at least once a year; | 5) Survey users to ensure training [has] been met | |
| | 6) Establish and maintain for critical NDU systems and continue to operate (COOP) plan, procedures and resources for ongoing operations under emergency situations | 6) Ensure COOP plans are current and tested annually | 6) Review test plans, procedures and test results | |
| | 7) Provide information assurance and security analysis on proposals related to new technologies and new operational policies within the university | 7) Test new technologies, security tools and procedures prior to implementation | 7) Review NDU projects for IA compliance and documentation | |
| Establish and administer a network operations security program | Create, maintain and update network security policies, procedures and operational guidance mandated by federal and DOD regulations | Ensure program documentation and resource assignment necessary to achieve and maintain DOD and federal compliance | Provide monthly network operational security activity reports to the NDU Chief Information Security Officer | 0.5% of total monthly price shall be deducted for documented deficiencies noted in monthly reviews for identified monitored activities that are not corrected within 30 days of notification or by mandated DOD and federal implementation deadlines. |

(R4, tab 12 at 33-34)

*Staffing under the Contract*

4. IBM had been providing IT support services to NDU under performance-based contracts for several years prior to 2005 (app. mot., Statement of Undisputed Material Facts (ASUMF) ¶ 1; gov't resp., Statement of Genuine Issues of Material Facts (GSGIMF) ¶ 1), when it was awarded TO 2 (ASUMF ¶ 2).

3

5. NDU staff had the opportunity to directly observe IBM's day-to-day performance under TO 2. IBM employees worked side-by-side and in the same location as NDU employees. (ASUMF ¶ 5)

6. IBM provided the government with a staffing plan at the contract's inception (ASUMF ¶ 15; GSGIMF ¶ 15). There are factual disputes concerning the content of the staffing plan, including whether certain personnel relevant to the government's claim were included in the staffing plan (R4, tab 8 at 18-20, 40-47; ASUMF ¶ 15; GSGIMF ¶ 15).

7. Of the 22 employees at issue in the government's claim, 4 had supported NDU prior to TO 2, under IBM's former contracts (ASUMF ¶ 16; GSGIMF ¶ 16).

8. Before making personnel changes during performance, IBM consulted with NDU officials about proposed personnel changes (ASUMF ¶ 20). IBM provided to the government resumes of new candidates for review and also gave the government an opportunity to meet new candidates for contract positions during task order performance (ASUMF ¶ 21; *see, e.g.,* R4, tabs 36, 38).

### *Network Intrusions and Subsequent Government Investigations*

9. The government identified a total of six malicious network intrusions during the period from January 2006 until June 2009. The six intrusions occurred on or about January 2006, November 2007, 4 November 2008, 14 May 2009, 17 June 2009, and 23 June 2009. The first network intrusion occurred in January 2006, but was not detected until November or December 2006 (ASUMF ¶ 24; GSGIMF ¶ 24; app. reply br., ex. A ¶ 24). Two of the six network intrusions occurred during TO 2's period of performance, from 2005 to September 2008 (ASUMF ¶ 23; GSGIMF ¶ 23).

10. The six attacks resulted in the exfiltration of unclassified but sensitive DoD information, including personally identifiable information of NDU students and faculty, expense and budget reports, and documents related to U.S. military technology and technical tradecraft. The attacks degraded NDU's network and compromised the DoD Non-Classified Internet Protocol Router Network (NIPRNET). (R4, tab 31 at 15-25)

### *Government's Demand Letter and Contracting Officer's Final Decision*

11. By letter dated 8 March 2013, the contracting officer (CO) issued a demand for payment of $8,998,187 allegedly owed as a result of IBM's failure to perform and deliver services as required under TO 2. The letter stated, in part:

> There were six (6) major network intrusions requiring IBM
> to execute network security IT services in the systems that IBM
> was to support under this Task Order. These intrusions

4

compromised the DoD computers assigned to the National Defense University (NDU), Fort McNair, Washington D.C., and commenced approximately January 2006

IBM failed to plan, develop, manage, and execute substantial network security IT services and related enterprise architecture management in accordance with the subject Task Order. Furthermore investigation revealed that IBM personnel did not have the appropriate subject matter expertise, and were not qualified to execute the IT security related tasks to properly plan, test and conduct specific tasks of IT security, as required in the subject Task Order. In addition, IBM failed to develop, test, and execute a proper network security incident response plan.

(R4, tab 22)

12. On 21 March 2013, IBM responded by letter, through counsel, denying liability (R4, tab 23).

13. On 23 May 2013, the Contracting Officer (CO) responded to IBM by letter and provided it copies of the Government Audit Net Security Reports. The CO also proposed a meeting for 12 June 2013 to discuss the findings of the government's audits. (R4, tab 25) The exhibits summarized the results of government investigations, during the period from 12 December 2006 through 9 January 2009:

- Exhibit #1: "National Security Agency Blue Team Assessment," dated 15 December 2006;
- Exhibit #2: "DISA NIPRNET Compliance Review," dated 18 May 2007;
- Exhibit #3: "Army Research Lab NDU Norfolk Campus DIACAP Status Report," dated 14 December 2007;
- Exhibit #4: "NDU IA Issues," dated 15 January 2008;
- Exhibit #5: "NDU DIACAP Out brief," dated 21 March 2008;
- Exhibit #6: "DISA Information Assurance Readiness Review (IARR)," dated 5 December 2008;
- Exhibit #7: "DISA Information Assurance Readiness Review Final Report," dated 9 January 2009

(R4, tab 24) The record does not contain full copies of these investigations, only summaries of the findings.

14. On 12 June 2013, the CO made a presentation concerning the government's investigations into IBM's performance of TO 2 (R4, tab 31). IBM was present at the

5

meeting where the CO delivered the presentation (*id.* at 2). The presentation slides identified a series of network security assessments by the government, apparently referencing the exhibits attached to the CO's 23 May 2013 letter (R4, tab 25).

15. The 12 June 2013 presentation also included a breakdown of the claimed total damages to the government resulting from IBM's alleged deficient performance.

| | | | | | | |
|---|---|---|---|---|---|---|
| 1) | **DISA Network Assessments** | | | | | |
| | 11-15 December 2006 | $137,874 | | | | |
| | 14-18 May 2007 | $114,741 | | | | |
| | 1-5 December 2008 | $113,965 | | | | |
| | 15-19 December 2008 | $105,331 | | | | |
| | | | | | | |
| 2) | **NDU Personal Identifying Info Protection Coverage** | | | | | |
| | 01 February 2009 – 31 January 2010 | $44,492 | | | | |
| | | | | | | |
| 3) | **Army Research Lab (ARL) IA Consultation & CNDSP** | | | | | |
| | 01 Dec 2006 – 30 Sept 2007 | $221,325 | | | | |
| | 1 Oct 2007 – 30 Sept 2008 | $265,590 | | | | |
| | 1 Oct 2008 – 30 Jun 2009 | $351,600 | | | | |
| | | | | | | |
| 4) | **Labor Mischarging and Labor Deficiencies (21 Individuals)** | | | | | |
| | 2005 – 2008 Contract Period | $4,037,019 | | | | |
| | | **Sub Total:** | **$5,277,973** | | | |
| | | | | | | |
| | | | | | | |
| 5) | **Total Contract Invoices PAID (July 2005-Sep 2008)** | $16,426,479 | | | | |
| | PWS Appendix C deficiency Areas | 8 | | | | |
| | Penalty for each deficiency Area (0.5%) | 0.005 | | | | |
| | | | **Sub Total:** | **$657,059** | | |
| | | | | | | |
| 6) | DIACAP Training Class (20 persons) | $19,049 | | | | |
| | | | Sub Total | $19,049 | | |
| | | | **Grand Total:** | **$5,954,081** | | |

(R4, tab 31 at 53)

6

16. On 13 June 2013, the Defense Contract Audit Agency (DCAA) completed a formal labor billing analysis identifying 22 individuals that purportedly billed at different labor category rates than those applicable to the actual tasks performed, and some who did not perform the minimum required elements of the task order (R4, tabs 26-27). This analysis was the basis of the claimed $4,037,019 in damages for "Labor Mischarging and Labor Deficiencies (21 Individuals)" set forth in the CO's 12 June 2003 presentation.

17. On 2 August 2013, IBM responded by letter, providing a detailed response to each of the government's allegations and denying liability (R4, tab 28). IBM contended, in part, that it did not warrant freedom from unauthorized access and is not contractually liable for security breaches (*id.* at 6). IBM further contended that its performance was subject to oversight by NDU's chief information officer and that NDU failed to implement many of IBM's recommendations for improving network security (*id.* at 3-4).

18. By letter dated 24 August 2015, the CO issued a COFD asserting a government claim for $5,903,353. The COFD stated that six major network intrusions had compromised the DoD computers assigned to the NDU, beginning in January 2006. Based on internal investigations, the COFD claimed:

> (1) [T]hat IBM failed to plan, develop, manage, and execute substantial network security IT services and related enterprise architecture management in accordance with the subject Task Order, (2) IBM failed to adhere to material requirements of the Task Order by failing to ensure that NDU's network was properly secured, managed, and maintained, and as a result of failing to meet material requirements and (3) IBM failed to apply or to execute necessary security safeguards, as required by the subject Task Order.

(R4, tab 29 at 1-2)

19. With respect to the internal investigations, the COFD stated that:

> The Defense Criminal Investigative Services (DCIS), Cyber Crimes Division conducted an investigation; in conjunction with examining Government network security audit reports, while consulting with Government Subject Matter Experts who specifically examined the network security posture of NDU and IBM's performance, it was determined that IBM was responsible for network security violations, labor mischarging and personnel security violations during IBM's contract performance.

(R4, tab 29 at 2)

7

20. The COFD further claimed that IBM personnel did not have the appropriate subject matter expertise and were not qualified to execute the IT security-related tasks required in the subject task order. The COFD also alleged that IBM failed to develop, test, and execute a proper network security incident response plan, and that IBM failed to execute their Quality Control Plan, which IBM stated would be used to identify the process for achieving all performance objectives of the PWS. The COFD concluded that IBM failed to perform all TO 2 requirements, as well as submitted invoices, and was paid, for work not performed. (R4, tab 29 at 1-2)

21. Appellant timely filed a notice of appeal from the 24 August 2015 COFD. The notice of appeal included a request that the government be required to file the complaint. The Board docketed the appeal as ASBCA No. 60332. On 22 February 2016, the government filed its complaint.

22. Paragraph 15 of the government's complaint states: "The task order PWS § 6.4.3 required: 'The Contractor shall operate and maintain baseline services and infrastructure in accordance with Appendix C (Operate and Maintain Baseline Services and Infrastructure).'" Subparagraph (a) of paragraph 15 further provides: "The tasks at Appendix C contained eight specific areas related to network security." The complaint then lists eight tasks appearing in the Required Service column of Appendix C that correlate to two desired functions. The associated desired functions are "Establish and administer IT security program" and "Establish and administer a network operations security program." (Compl. ¶ 15; *see also* SOF ¶ 3) Subparagraph (b) of paragraph 15 provides: "Each of the eight areas contained performance standards and acceptable quality levels ('AQLs')." It then lists the eight items appearing in the "Performance Standard and AQL" column of Appendix C associated with the same two desired functions. (*Id.*)

## PARTIAL MOTION TO DISMISS FOR LACK OF JURISDICTION

Appellant contends that we lack jurisdiction to entertain the government's allegations in its complaint that IBM failed to meet the "acceptable quality levels" (AQLs) set forth in the contract for network security, because those allegations were not within the COFD.[1] Appellant moves to strike the allegations relating to the network security AQLs from the government's complaint. (App. mot. at 19)

We conclude that allegations in the complaint relating to AQL deficiencies relate to the same set of "operative facts" set forth in the COFD and, therefore, fall within the

---

[1] In the contract's statement of work, performance standards are expressed as acceptable quality levels or AQLs (R4, tab 1 at 112).

8

scope of the COFD. We deny appellant's partial motion to dismiss and/or to strike these allegations from the government's complaint.

## DISCUSSION

The scope of the Board's jurisdiction is determined by the contents of the claims submitted to the CO who issues a decision on said claims which are timely appealed to the Board. Thus the claim, and not the complaint, determines the scope of our jurisdiction. *American General Trading & Contracting, WLL*, ASBCA No. 56758, 12-1 BCA ¶ 34,905 at 171,639; *see also U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 15-1 BCA ¶ 35,957 at 175,706 (citing *Optimum Services, Inc.*, ASBCA No. 57575, 13 BCA ¶ 35,412 at 173,726) ("The Board lacks jurisdiction over claims raised for the first time on appeal."). In *Placeway Construction Corporation v. United States*, 920 F.2d 903, 907 (Fed. Cir. 1990), the Federal Circuit explained that in determining whether an issue constitutes a new or separate claim, "the court must assess whether or not the claims are based on a common or related set of operative facts." In determining a claim's scope, we are not limited to the claim document but may examine the totality of the circumstances. *Sauer Incorporated*, ASBCA No. 60366, 16-1 BCA ¶ 36,565 at 178,101.

Appellant asserts that the government's allegation that IBM's performance failed to meet the network security AQLs specified in the task order, set forth in paragraph 15, subparagraph (b) of complaint, was not asserted in a government claim or in the COFD and is, therefore, not properly before the Board (app. mot. at 19).[2] At paragraph 15 of the government's complaint, the government identifies eight tasks, and their associated AQLs, as concerning network security; these are the tasks associated with the "Establish and administer IT security Program" and "Establish and administer a network operations security program" functions in Appendix C (SOF ¶¶ 22, 18). For the purposes of this motion, we will refer to these desired functions, collectively, as the network security functions.[3]

The government argues that the COFD's reference to IBM's failure to complete tasks corresponding to three desired functions, which includes the network security

---

[2] Appellant also argues that the Board lacks jurisdiction over the government's complaint to the extent that it seeks relief on the basis of the follow-on task order contract performed by IBM from 3 September 2008 to 2 September 2009 (app. mot. at 25). The government has acknowledged and agreed that the follow-on task order is not a part of the government claim before the Board in this appeal and states that the government has lodged no claim against appellant under the follow-on task order contract (gov't resp. at 25).

[3] We will refer to the tasks associated with the network security functions as the network security tasks; we will refer to the AQLs associated with the network security functions as network security AQLs.

functions, "are sufficient references to the AQLs to maintain the Board's jurisdiction regarding any issue alleging that IBM failed to meet network security AQLs" (gov't resp. at 21). It further contends that appellant was aware, at the time the COFD was issued, that a portion of the claimed damages was attributable to AQL deficiencies (*id.* at 22).

A comparison of the language of the COFD and the complaint demonstrates that they are based on the same operative facts. The COFD states that "IBM failed to plan, develop, manage, and execute substantial network security IT services" (SOF ¶ 18). It also references the contractor's responsibility to perform network security tasks in accordance with TO 2 and alleges that IBM did not properly perform these tasks (*see id.*). The language of the complaint is more specific. Paragraph 15 of the complaint recites specific portions of the contract's performance work statement and enumerates eight specific tasks relating to network security at the NDU (compl. ¶ 15.a.; SOF ¶¶ 3, 22). It further enumerates the AQLs associated with each of the eight tasks (compl. ¶ 15.b.). Finally, it describes the contractual penalty for failing to meet the AQLs – a deduction of 0.5% of the total monthly price for each documented deficiency that is not corrected within 30 days (compl. ¶ 15.c.).

Appellant cites this penalty clause as the alleged factual distinction between the claim in the COFD and the allegations in the complaint. According to appellant, the 0.5% penalty was not part of the government's claim (app. mot. at 20). Appellant's argument elevates form over substance. While the language of the complaint is more specific, the COFD expressly references the contractor's responsibility to perform network security tasks in accordance with TO 2 and alleges that IBM did not properly perform these tasks (*see* SOF ¶¶ 18, 19). TO 2 provides that monthly invoices are to be deducted by 0.5% for AQL deficiencies (*see* SOF ¶ 3). The COFD's reference to IBM's failure to perform the "network security tasks" set forth in TO 2 encompasses the specific tasks and associated AQLs alleged in the complaint and set forth in the TO. Although the allegations in the complaint are more detailed and specific, they are based on the same operative facts as the COFD. *See DSP, Inc.*, ASBCA No. 32869, 87-1 BCA ¶ 19,452 at 98,290 (fact that one claim included a specific item of damage that did not appear in the other claim was not sufficient to treat claims as being separate and discrete). Indeed, in order to adjudicate whether IBM failed to perform network security tasks as claimed in the COFD, or whether it failed to meet the AQLs for specific network security tasks as alleged in the complaint, the Board must review the same evidence concerning IBM's performance of network security tasks. *See Lael Al Sahab & Co.*, ASBCA Nos. 58344, 59009, 15-1 BCA ¶ 35,809 at 175,130 (quoting *Placeway Constr.*, 920 F.2d at 907) (holding that if the Board "will have to review the same or related evidence to make its decision, then only one claim exists").

Moreover, there is evidence that the 0.5% deduction accounts for a portion of the government's claimed damages in the COFD. Prior to issuing the COFD, the CO conducted a presentation regarding the government's claim against IBM, at which IBM

10

was present (SOF ¶ 14). The presentation divided into parts the government's claim, stating that approximately $657,059 of the government's $5,903,353 claim is attributable to a 0.5% penalty against all invoices paid between July 2005 and September 2008 for Appendix C deficiencies (SOF ¶ 15). Appellant offers no rebuttal to this evidence in support of its contention that the AQL deficiencies were not included in the government's claim (*see generally* app. reply br.). The 0.5% contractual penalty, which appellant contends applies only to AQL deficiencies, appears to always have been a part of the government's claimed damages. The complaint's direct reference to network security AQLs merely provides details about the government claim, where the language of the COFD includes the broad assertion that IBM is liable for failure to provide network security services in accordance with TO 2.

Even if the Board concluded that the COFD did not state a claim on the basis of AQL deficiencies, the allegations in the complaint only would assert a new legal theory for recovery. The complaint seeks the same relief. The operative facts for these allegations in the complaint are the same as those underlying the claim as stated in the COFD. Both the claim and the complaint require examining the facts regarding how IBM performed the network security functions under TO 2. The assertion of a differing legal theory for recovery, when based on the same operative facts, does not defeat our jurisdiction. *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003).

Appellant's partial motion to dismiss and/or to strike from the complaint all allegations that IBM failed to meet the network security AQLs is denied.

## MOTION FOR SUMMARY JUDGMENT

We turn next to appellant's motion for summary judgment. The basis for appellant's motion is that the government's claim is time-barred by the six-year statute of limitation set forth in the CDA, 41 U.S.C. §§ 7101-7109. We find the current record to be inadequate to sustain a finding that the government's claim is time-barred and deny summary judgment in appellant's favor.

## DISCUSSION

### I.    *Summary Judgment Standard*

Summary judgment is appropriate when, drawing all inferences in the non-movant's favor, the movant establishes that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). It is appellant's burden as movant to show by undisputed material facts that the government's claim is time-barred under the

11

CDA. *See Supreme Foodservice GmbH,* ASBCA No. 57884 *et al.,* 16-1 BCA ¶ 36,426 at 177,582.

## II.    *Six-Year Statute of Limitations Under the CDA*

The CDA requires a contract claim to be "submitted within 6 years after the accrual of the claim." 41 U.S.C. § 7103(a)(4)(A). A claim accrues under the CDA when "all events, that fix the alleged liability...and permit assertion of the claim, were known or should have been known." Some injury must have occurred; however "monetary damages need not have been incurred." FAR 33.201. The events fixing liability should have been known when they occurred unless they can be reasonably found to have been either concealed or "inherently unknowable" at that time. *Raytheon Missile Systems,* ASBCA No. 58011, 13 BCA ¶ 35,241 at 173,017.

Appellant alleges that there is no genuine dispute over certain facts which establish that "the claims asserted in the complaint accrued more than six years before the Government asserted them" (app. mot. at 1). Appellant divides the government claim into two claims with different accruals, arguing that the government is asserting entitlement to costs on the basis of two legal theories: (1) a claim for costs for breach of contract due to deficient performance under the task order, and (2) a claim for labor mischarging (app. mot. at 6). We first address the date on which the government filed its claims, and then address the dates on which those claims allegedly accrued.

### A.    Date of the Government's Claims

At the outset, we note that appellant has failed to establish, or even propose, as an undisputed material fact a date on which the government submitted its claims (*see generally,* ASUMF). However, appellant's brief argues that the government did not issue its claims until, at the earliest, 8 March 2013, when it issued a demand for payment letter (app. reply br. at 1-2). Appellant also argues that the government's claims accrued more than six years before 8 March 2013. We understand this to mean that, for purposes of its motion, appellant accepts that the government filed its claims on 8 March 2013. The government, for its part, also refers to the 8 March 2013 demand letter as a claim, referring to the letter as "demanding the sum certain of $8,998,187.87" (gov't opp'n at 2, 15), and arguing that the CO's 8 March 2013 demand letter was within the six-year statute of limitations (*id.* at 4). In the alternative, the government argues that the COFD on 25 August 2015 was within the six-year statute of limitations, on the grounds that the claim accrued no earlier than 4 April 2012, when DCIS reported its findings to the CO (compl. ¶ 7).

We conclude that the government first asserted its claim on 8 March 2013, when it issued a demand letter for the sum certain amount of $8,998,187 (SOF ¶ 11). The government's demand letter satisfies the definition of "claim" set forth in FAR 2.101,

12

because it contains a "written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain." FAR 2.101; *Eaton Contract Services, Inc.*, ASBCA No. 52888 *et al.*, 02-2 BCA ¶ 32,023 at 158,267 (total overall demand for payment of a specific dollar amount meets the FAR's requirement that a monetary claim be for a sum certain). The 8 March 2013 demand letter is distinct from a "voucher, invoice, or other routine request for payment that is not in dispute when submitted," because IBM unequivocally denied liability for the payment demand on 21 March 2013, when its counsel responded to the CO's letter (SOF ¶ 12). The parties continued to dispute both liability and quantum during their subsequent discussions, which culminated in the COFD, dated 25 August 2015. (SOF ¶ 17; compl. ¶ 19).

## B. The Dates of Alleged Accrual

A claim accrues "when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known." FAR 33.201. The "knew or should have known test" includes a reasonableness component regarding "what facts were reasonably knowable to the claimant. Summary judgment is not normally appropriate where reasonableness and subjective knowledge are facts at issue." *Kellogg Brown & Root Services, Inc.*, ASBCA Nos. 58518, 59005, 16-1 BCA ¶ 36,408 at 177,528 (quoting *Raytheon Company*, ASBCA No. 58840, 15-1 BCA ¶ 36,000 at 175,868). To determine when the alleged liability was fixed, we begin by examining the legal basis of a particular claim. *Gray Personnel, Inc.*, ASBCA No. 54652, 06-2 BCA ¶ 33,378 at 165,475.

### i. Deficient Performance Claim

Appellant asserts that the government's deficient performance claim accrued at the time of the first network intrusion in January 2006, or, at the latest, by December 2006, when the government discovered the first network intrusion (app. mot. at 7-8). The government argues that it could not have known of its claim against IBM until it completed an investigation of the network intrusion (gov't opp'n at 14).

IBM has failed to demonstrate by undisputed facts that the government knew or should have known at the time of the discovery of the first network intrusion that the government was aware of the facts concerning IBM's performance of TO 2 requirements. The government's claim is based, in part, on the contention that the network intrusions were caused by IBM's failure to perform network security IT services and enterprise architecture management in accordance with TO 2 (SOF ¶ 15). IBM has established only the time of the first network intrusion, the time of discovery of the first network intrusion, and that IBM staff worked in the same location as NDU employees (*see* SOF ¶¶ 10, 14). This is not sufficient for the Board to conclude that, at the time of the discovery of the network intrusion, the government knew or reasonably should have known of its claim

13

against IBM, especially in light of the government's assertion that multiple investigations were necessary to reveal the alleged deficiencies in IBM's performance that serve as the basis for the government's claim (gov't opp'n at 2-3).

The Board also rejects appellant's characterization of the government's brief as conceding that the government had knowledge in December 2006 of findings of the investigation that are the basis for the government's claim (*see* app. reply br. at 8). Appellant refers to language in the government's brief that provides: "these items [the alleged acts and omissions giving rise to the government's claim] were noted after a Defense Information Systems Agency ('DISA') Incident Response & Recovery Team (IRRT) visit on 30 November 2006 to 15 December 2006" (gov't resp. at 18). The government's brief concedes the timing of DISA's visit, but not the timing of when DISA could report its findings. Moreover, a separate part of the government's brief asserts that the government's claim was based on the findings of the Defense Criminal Investigative Service investigation, which was not completed until 4 April 2012 (gov't opp'n at 2-3, ¶ 3).

In addition, the record is incomplete regarding the scope, nature, and details of the government's internal investigations. Although the record contains slides from the government's 12 June 2003 presentation with some information about the dates of its internal investigations (SOF ¶ 14), as well as copies of a series of government audit net security reports (SOF ¶ 13), the summary nature of these reports do not provide sufficient detail to determine the relationship between the government's audit findings and the network intrusions. Moreover, as IBM itself pointed out in its response to the government's initial claim, there are significant disputes of material fact regarding whose responsibility it was to implement various network security measures designed to prevent network intrusions (SOF ¶ 17). In order to draw conclusions about the timing and scope of the government's knowledge of the network intrusions, and IBM's alleged failure to prevent the intrusions, we would need significantly more information about the government's investigations.

The multiple investigations, and the lack of detailed information about those investigations in the record, raise a genuine issue of material fact regarding when the government should reasonably have known of its deficient performance claim against IBM. As such, summary judgment is not appropriate with respect to the deficient performance claim.

### ii.    Labor Mischarging Claim

Appellant separately asserts that the government's labor mischarging claim is time-barred (app. mot. at 9-11). The only date proposed and established by appellant as undisputed that relates to the labor mischarging claim is September 2008, the month when TO 2 performance was completed (SOF ¶ 9). Appellant contends that the latest the

14

government claim could have accrued is September 2008, "the latest month for which the Government asserts that NDU was overcharged" (app. mot. at 10). Appellant further alleges that the first time the government asserted a claim for labor mischarging was in the 24 March 2015 COFD. Appellant does not argue that the 8 March 2013 demand letter is not a claim; it only argues that the 8 March 2013 letter does not include a claim for labor mischarging. Accordingly, appellant contends that the labor mischarging claim is time-barred because the latest the claim could have accrued was at the end of IBM's performance of TO 2 in September 2008, more than six years prior to the 24 March 2015 COFD. (*Id.*)

The government has stated that the primary concern of the government's labor mischarging claim is that "IBM mischarged the government for personnel who did not meet the contractually specified qualifications" (gov't resp. at 20; compl. ¶ 15) The 8 March 2013 letter states: "Furthermore investigation revealed that IBM personnel did not have the appropriate subject matter expertise, and were not qualified to execute the IT security related tasks to properly plan, test and conduct specific tasks of IT security, as required in the subject Task Order" (SOF ¶ 11). In light of this language, we see no basis to determine that the 8 March 2013 letter does not encompass the government's labor mischarging claim. Accordingly, the Board need not assess if the claim could have accrued any later than September 2008 because the 8 March 2013 demand letter was issued within six years of the end of the task order performance.

Appellant's alternative arguments alleging earlier accrual of the government's labor mischarging claim are not supported by undisputed facts. Appellant argues that all but 4 employees that serve as the basis for the labor mischarging claim were engaged on the task order before March 2007, and, therefore, it is entitled to summary judgment with respect to those 18 employees on the basis that the government would have received their resumes at the time the employees were hired (app. mot. at 10). We disagree. While appellant established undisputed facts concerning general routines for hiring new personnel during performance of the task order (*see* SOF ¶ 13), appellant failed to establish or even propose the dates when the 18 individuals were hired under TO 2. Accordingly, appellant has failed to establish as an undisputed fact the timing of the 18 individuals' employment. Appellant also argues that all charges for invoices submitted prior to March 2007 should be dismissed under summary judgment and asserts that any aspect of the government's claim relating to background investigations also is time-barred (app. mot. at 11-12). Appellant failed to establish facts regarding the date of specific invoices for which it seeks summary judgment. Nor did it establish any facts concerning how background investigations were conducted under the task order.

Thus, we conclude that the current record is inadequate to sustain a finding that the government's claim is time-barred and deny appellant's motion for summary judgment as to the labor mischarging claim.

## III.  *Partial Summary Judgment as to AQLs*

Appellant also contends that it is entitled to summary judgment on the portion of the government's claim that alleges IBM failed to meet the network security AQLs (app. mot. at 21).  Appellant contends that an AQL violation occurs only if a relevant deficiency is noted in monthly metric reports, and there is no dispute that none were reported (app. mot. at 21; *see also* ASUMF ¶ 12; GSGIMF ¶ 12).  However, the government has disputed the veracity of the information contained in the monthly metric reports (*see* gov't opp'n at 2-3, ¶ 3).  IBM prepared monthly metric reports as a deliverable under the contract (R4, tab 12 at 23; GSGIMF ¶ 10).  The government contends that its investigation revealed that security patches were missing, documentation was lacking, and that information systems were not in compliance with DoD configuration standards at the time when IBM was reporting no deficiencies and policy compliance in its reports.  It also asserts that the reports were not properly signed, certified, or accredited.  (Gov't opp'n at 2-3, ¶ 3)

As the government factually has challenged the documents upon which appellant relies to establish that there were no AQL deficiencies, it has established a material fact in dispute.  Appellant's argument that the audit reports are not relevant to the question of AQL deficiencies is unpersuasive.  Appellant asserts that only the information in the monthly reports is relevant to the question of whether there were AQL deficiencies, because there is no contractual right to recover 0.5% of invoice payments based upon audit findings.  (App. reply at 17)  In this instance, the government does not use the audit report as an independent basis for a claim, but rather as evidence to dispute the factual information contained in IBM's monthly reports.  This is sufficient to create a genuine issue of material fact that precludes our granting summary judgment in appellant's favor.

## MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Finally, appellant also has moved to dismiss the government's complaint for failure to state a claim upon which relief can be granted, alleging that the complaint is insufficient to state a claim for labor mischarging.  Specifically, appellant contends that the complaint's allegations do not identify any contractual provision specifying that particular tasks may be performed by a person in a specific labor category.

The complaint contains two allegations concerning labor mischarging.  First, the government alleges that "[IBM billed] 22 individuals...at different labor category rates than those applicable to the actual tasks performed."  Second, the government alleges that some of those 22 individuals "did not perform the minimum required elements of the task order."  The complaint also references DCAA's analysis of 22 specific employees, which found examples of unqualified personnel and defective performance.  (Compl. ¶ 18)

16

## A. Standard of Review

Dismissal for failure to state a claim upon which relief can be granted is appropriate where the facts asserted in the complaint do not entitle the claimant to a legal remedy. *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). The Board will grant a motion to dismiss for failure to state a claim when the complaint fails to allege facts plausibly suggesting (not merely consistent with) a showing of entitlement to relief. *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). In deciding a motion to dismiss for failure to state a claim, "the court must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant." *Kellogg Brown & Root Services, Inc. v. United States*, 728 F.3d 1348, 1365 (Fed. Cir. 2013). In this review, "[w]e decide only whether the claimant is entitled to offer evidence in support of its claims, not whether the claimant will ultimately prevail." *Matcon Diamond, Inc.*, ASBCA No. 59637, 15-1 BCA ¶ 36,144 at 176,407. The scope of our review is limited to considering the sufficiency of allegations set forth in the complaint, "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (citing 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed. 2004)). For purposes of assessing whether an appeal before us states a claim upon which relief can be granted, the primary document setting forth the claim is not the complaint, *per se*, but is either the contractor's claim or the government's claim, the letter asserted in a COFD as required by the Contract Disputes Act, 41 U.S.C. § 7103(a)(3). *Lockheed Martin Integrated Systems, Inc.*, ASBCA Nos. 59508, 59509, 17-1 BCA ¶ 36,597 at 178,281.

## B. The Parties' Contentions

Appellant contends that the government has failed to state a claim for breach of contract, because the complaint's allegations do not identify any contractual provision specifying that particular tasks may only be performed by a person in a specific labor category. According to appellant, the contract required merely that IBM bill based on labor rates defined by each worker's labor category, not by the actual tasks performed (app. reply at 15-16). Appellant relies on pre-award discussions concerning IBM's proposed staffing approach to demonstrate that the government was aware that IBM personnel assigned to the task order would not be limited to supporting only certain tasks or sub-areas (app. mot. at 18).

In response, the government insists that the primary concern in its complaint is that IBM mischarged the government for personnel who did not meet the contractually-specified qualifications, not that contractor personnel worked on tasks outside their assigned labor categories. According to the government, it does not matter what task an employee is performing if the government is consistently paying the contractor for a more costly labor category. The government also notes that the complaint references the DCAA's

17

investigation into labor mischarging, including DCAA's analysis of 22 specific employees, and that the allegations in the complaint are sufficient to state a claim labor mischarging based on unqualified personnel (gov't resp. at 20).

### C. The Government has Stated a Claim for which Relief May be Granted

Appellant's contention that the complaint is deficient, because it does not identify a contractual provision requiring particular tasks to be performed by a person in a specific labor category, fails to account for the complaint's allegations that individuals failed to meet contractual specifications. We read the labor mischarging allegations in the complaint more broadly; as alleging both that appellant overcharged for tasks performed by certain individuals, and that certain individuals did not perform the minimum required elements of the task order.

Our understanding of the complaint's allegations is reinforced by the specific factual allegations set forth in the COFD. *See Lockheed Martin Integrated Systems,* 17-1 BCA ¶ 36,597 at 178,281 (holding that Board will examine complaint and COFD in analyzing a motion for dismiss for failure to state a claim). Although the complaint could have been more specific in terms of identifying alleged violations of contractual terms, the COFD alleges that IBM employees violated the task order by failing to perform "tangible work in the area of quality assurance, network security and enterprise architecture as prescribed in the PWS" (R4, tab 29 at 2). Moreover, with respect to employee qualifications, the COFD alleges that IBM personnel "did not have the appropriate subject matter expertise, and were not qualified to execute the IT security related tasks to properly plan, test and conduct specific tasks of IT security, as required in the subject Task Order" (SOF ¶ 18). Taken together, the allegations in the complaint and the COFD are sufficient to state a claim for labor mischarging.

### CONCLUSION

For these reasons, each of appellant's motions is denied.

Dated: 8 March 2018

KENNETH D. WOODROW
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

18

I concur

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60332, Appeal of IBM Corporation, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

19