# United States Court of Appeals for the Federal Circuit

---

**JOHNATHAN H. DINH, DWIGHT D. JERECZEK, SANDY CHUAN-DINH, DEBORAH JERECZEK, STAN ELLIOTT, RYAN TRAN, THANH NGA TRAN, WALTER NAHM, LAUREN NAHM, PAMELA PAYSON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2023-2100

---

Appeal from the United States Court of Federal Claims in No. 1:22-cv-00725-EGB, Senior Judge Eric G. Bruggink.

---

Decided: July 31, 2025

---

ROGER J. MARZULLA, Marzulla Law, LLC, Washington, DC, argued for plaintiffs-appellants. Also represented by NANCIE GAIL MARZULLA.

NATHANAEL YALE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented

by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, LOREN MISHA PREHEIM.

———————————

Before MOORE, *Chief Judge*, STOLL, *Circuit Judge*, and GILSTRAP, *District Judge*.[1]

STOLL, *Circuit Judge*.

Plaintiffs-Appellants Johnathan Dinh, Dwight Jereczek, Sandy Chuan-Dinh, Deborah Jereczek, Stan Elliott, Ryan Tran, Thanh Nga Tran, Walter Nahm, Lauren Nahm, and Pamela Payson are owners of certain bonds issued by an instrumentality of the Commonwealth of Puerto Rico. They sued the United States for the alleged taking of their private property—the diminished principal and interest value of their bonds and their lost security interest. The United States Court of Federal Claims determined it had subject matter jurisdiction over their action but nevertheless dismissed it for failure to state a claim upon which relief could be granted. For the following reasons, we affirm.

BACKGROUND

Plaintiffs-Appellants filed a class-action lawsuit against the United States in the United States Court of Federal Claims ("Claims Court") alleging that the United States effected a taking under the Fifth Amendment when it enacted the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). Pub. L. No. 114-187, 130 Stat. 549 (codified at 48 U.S.C. § 2101 *et. seq.*).

Plaintiffs-Appellants own bonds issued by the Puerto Rico Sales Tax Financing Corporation, the Corporación del Fondo de Interés Apremiante ("COFINA"). They allege

———————————

[1] Honorable Rodney Gilstrap, District Judge, United States District Court for the Eastern District of Texas, sitting by designation.

that they "lost a significant portion of the principal and interest" of their bonds because COFINA restructured its debts pursuant to PROMESA's debt restructuring provision. J.A. 81 ¶ 31 (Complaint). In plain terms, Plaintiffs-Appellants point to the differential between what they would have received had COFINA not restructured its debts and the amount they actually received as the property allegedly taken by the United States.

I

Puerto Rico created COFINA in 2006 in response to a fiscal crisis. Puerto Rico had consistently spent more than it received in taxes and other revenues, borrowing to cover the difference. Eventually, Puerto Rico neared the limits on sovereign debt permitted under its Constitution, which strained its ability to access credit markets. Puerto Rico created COFINA as a public corporation, independent from the Puerto Rican Government, to issue secured bonds ("COFINA bonds") to raise funds for the Commonwealth.[2] P.R. Laws Ann. tit. 13, §§ 11a–16. When COFINA bonds come due, bondholders are repaid principal and interest out of a dedicated fund—the Dedicated Sales Tax Fund ("DSTF")—which is funded by a sales and use tax ("SUT") imposed by Puerto Rico. COFINA, not Puerto Rico, has complete ownership and control of this fund. *Id.* § 12. By May 2017, COFINA had issued over $17 billion in COFINA bonds.

Puerto Rico's financial crisis continued to worsen, but Puerto Rico and its instrumentalities[3] could not access the

---

[2]    Consistent with the parties and the Claims Court, this opinion uses the terms "Puerto Rico" and "the Commonwealth" interchangeably.

[3]    These instrumentalities include, for example, Puerto Rico's power, water, and highway public utilities, which were more than $20 billion in debt by 2013.

federal municipal bankruptcy process because Congress excluded Puerto Rico from being a debtor under Chapter 9 of the Bankruptcy Code, under which municipalities restructure their debts. 11 U.S.C. § 101(52). Congress enacted PROMESA to create "a system for overseeing Puerto Rico's finances, while also enabling the Commonwealth to gain bankruptcy protections similar to those available under the [Bankruptcy] Code" to address the "fiscal emergency" in the Commonwealth. *Fin. Oversight & Mgmt. Bd. for P.R. v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 342 (2023). In furtherance of this purpose, PROMESA established a seven-member Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") "to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets." 48 U.S.C. § 2121.

Subchapter III of PROMESA permits the adjustment of debts through the Title III restructuring process. So-called Title III proceedings generally mirror federal bankruptcy court proceedings and permit a party to petition a federal court to compel the creation and enforcement of a plan of adjustment. *See id.* § 2164 (describing the petition process under Title III); *see also id.* § 2161(a) (incorporating various provisions of the U.S. Bankruptcy Code, *e.g.*, 11 U.S.C. § 106). Under PROMESA, the Oversight Board represents Puerto Rico in Title III cases. *Fin. Oversight & Mgmt. Bd. for P.R.*, 598 U.S. at 343.

The Oversight Board has "sole discretion" to "designate any territorial instrumentality[4] as a covered territorial

---

4    "The term 'territorial instrumentality' means any political subdivision, public agency, instrumentality—including any instrumentality that is also a bank—or public corporation of a territory, and this term should be broadly construed to effectuate the purposes of this chapter." 48 U.S.C. § 2104(19)(A).

instrumentality that is subject to the requirements of this chapter." 48 U.S.C. § 2121(d)(1)(A); *see also id.* § 2121(d)(1)(B)–(E) (authorizing the Oversight Board "in its sole discretion" to take various actions—such as requiring budgets—to oversee territorial instrumentalities); *id.* § 2121(d)(2)(A) (granting the Oversight Board the "sole discretion . . . [to] exclude any territorial instrumentality from the requirements of this chapter"). PROMESA explicitly emphasizes the autonomy of the Oversight Board—stating that "[n]either the Governor nor the Legislature may . . . exercise *any control, supervision, oversight, or review* over the Oversight Board or its activities; or . . . enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of this chapter, *as determined by the Oversight Board.*" *Id.* § 2128(a) (emphases added). PROMESA's delineation of the Oversight Board's duties related to issuing a restructuring certification also emphasizes the Oversight Board's autonomy. *Id.* § 2146(a) ("The Oversight Board, prior to issuing a restructuring certification regarding an entity . . . *shall determine, in its sole discretion*, that . . . the entity has made good-faith efforts to reach a consensual restructuring with creditors." (emphasis added)).

## II

Within a few months of PROMESA's enactment, the Oversight Board designated COFINA as a covered instrumentality subject to the requirements of PROMESA and eligible to qualify as a debtor under Title III. The following overview of the Title III proceeding underlying this action provides necessary background for understanding the issues on appeal.

At the outset, COFINA bondholders and the Commonwealth disputed who had superior rights in the SUT revenues deposited in the DSTF used to repay principal and interest on COFINA bonds as they became due. The Oversight Board determined that the best path to resolving the

dispute was to file Title III petitions for both COFINA and the Commonwealth to afford the parties "additional time and breathing room to seek to resolve the impasse under the supervision of the Title III Court." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 361 F. Supp. 3d 203, 223 (D.P.R. 2019), *aff'd*, 987 F.3d 173, 177 (1st Cir. 2021). After filing the respective Title III cases, "[t]he Oversight Board analyzed various options for resolving the dispute and determined that the best path forward was to . . . appoint[] [] independent Oversight Board agents to serve separately as the respective representatives of the Commonwealth and COFINA in the Commonwealth-COFINA Dispute." *Id.* at 223–24. The parties eventually reached an agreement resolving the dispute based on arm's-length negotiations between the appointed agents, which allocated the disputed SUT revenues as follows: 53.65% to COFINA, and 46.35% to the Commonwealth. *Id.* at 225. The Oversight Board then applied this framework in formulating COFINA's plan of adjustment.[5] *Id.* at 225–26. The Title III court confirmed the adjustment plan, and it was implemented.

### III

Plaintiffs-Appellants then brought suit on behalf of a class of COFINA bondholders, alleging that Congress took their interests in COFINA bonds when it enacted PROMESA. J.A. 81 ¶ 31 (Complaint) (alleging loss of principal, interest, and security interest in COFINA funds). The Government moved to dismiss the Complaint, arguing that the Claims Court lacked subject matter jurisdiction and that Plaintiffs failed to state a claim. The Claims Court rejected the Government's argument that

---

[5]    Under the Oversight Board's plan, senior COFINA bondholders would make a 93.01% recovery on their bonds while junior COFINA bondholders would make a 56.41% recovery.

PROMESA displaced Tucker Act jurisdiction. The court explained, "we do not find in PROMESA the kind of clear congressional intent required to displace this court's jurisdiction under the Tucker Act." *Dinh v. United States*, 166 Fed. Cl. 513, 525 (2023). The court reasoned that (1) "requiring plaintiffs to bring their takings claim in district court amounts to limiting the remedies they may seek" because "[t]he Little Tucker Act . . . allows the district court to award only up to $10,000 of monetary relief—which is less than the amount plaintiffs seek in this action"; and (2) "plaintiffs lack a basis for injunctive or declaratory relief because they do not allege that PROMESA fails to meet the public use requirement or is so arbitrary as to violate due process." *Id.* at 525–26.

After finding jurisdiction, the Claims Court granted the Government's motion to dismiss for failure to state a claim, explaining that "Congress's enactment of PROMESA is not sufficient federal government action to constitute a taking" because "plaintiffs cannot complete their claim here without relying on what turn out to be the actions of independent actors." *Id.* at 530–31. Relying on the legal framework set forth in *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1154 (Fed. Cir. 2014), the court explained "it is clear that plaintiffs could not establish either an agency relationship or coercion in this case as a matter of law" to satisfy the required Government action for a taking claim. *Dinh*, 166 Fed. Cl. at 531 (citing *A & D Auto Sales*, 748 F.3d at 1154).

Plaintiffs-Appellants appeal. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We first address the Government's contention that the Claims Court erred in concluding it possessed subject matter jurisdiction to hear this case. We then turn to Plaintiffs-Appellants' argument that we should reverse the Claims Court's dismissal because the Complaint

adequately alleged a Government-authorized taking effected by PROMESA. Finally, we address Plaintiffs-Appellants' contention that the Claims Court abused its discretion by declining to allow them to amend their Complaint.

I

We review "whether the Court of Federal Claims possesses subject-matter jurisdiction de novo." *Biltmore Forest Broad. FM, Inc. v. United States*, 555 F.3d 1375, 1380 (Fed. Cir. 2009) (citation omitted).

As relevant here, the Tucker Act waives sovereign immunity for, and provides for Claims Court jurisdiction over, monetary claims against the United States "founded [] upon . . . the Constitution . . . or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). "A Fifth Amendment takings claim falls within the Tucker Act's grant of jurisdiction because it is a 'claim against the United States founded upon the Constitution.'" *Acceptance Ins. Cos. Inc. v. United States*, 503 F.3d 1328, 1336 (Fed. Cir. 2007) (citation omitted). To have jurisdiction under the Tucker Act, a plaintiff must identify a separate source of law that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (cleaned up). "It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction." *Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008).

The Government argues that the Claims Court erred in concluding it possessed jurisdiction to hear this case "because Congress explicitly directed that all cases arising under PROMESA, 'in whole or in part,' must be pursued in the District of Puerto Rico." Appellee's Br. 5. The Government recognizes that, "[a]s a general matter," the Claims Court "has jurisdiction to entertain takings claims seeking

just compensation." Appellee's Br. 20. The Government contends, however, that Congress may—and, here, did— "displace" the Claims Court's jurisdiction, "including over constitutional takings claims." Appellee's Br. 21. The Government also argues that Congress's unambiguous intent that all claims arising out of PROMESA be brought in the District of Puerto Rico is sufficient to displace Tucker Act jurisdiction. Appellee's Br. 30. We disagree. We hold that PROMESA does not displace Tucker Act jurisdiction.

A determination of displacement of jurisdiction requires "an unambiguous [Congressional] intention to withdraw the Tucker Act remedy." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019 (1984). Where Congress provides a "precisely drawn, detailed statute" that "contains its own judicial remedies," that "specific remedial scheme establishes the exclusive framework for the liability Congress created under the statute . . . . [because a] self-executing remedial scheme supersedes the gap-filling role of the Tucker Act." *United States v. Bormes*, 568 U.S. 6, 12–13 (2012) (internal citation omitted). On the other hand, when the Tucker Act is "capable of co-existence [with another statute], it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to reward each as effective." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 133–34 (1974) (internal quotation and citation omitted).

PROMESA's relevant statutory provision states:

(a) Jurisdiction

Except as provided in section 2124(f)(2) of this title (relating to the issuance of an order enforcing a subpoena), and subchapter III (relating to adjustments of debts), any action against the Oversight Board, and *any action otherwise arising out of this chapter, in whole or in part, shall* be brought in a United States district court for the covered territory or, for any covered territory that does not have

a district court, in the United States District Court for the District of Hawaii.

48 U.S.C. § 2126(a) (emphasis added).

PROMESA's provision falls short of the "specific and comprehensive scheme for administrative and judicial review" that we have found sufficient to displace the Tucker Act. *Vereda, Ltda. v. United States*, 271 F.3d 1367, 1375 (Fed. Cir. 2001) (citation omitted) (Tucker Act displaced where "statutes provide for a comprehensive administrative and judicial system to review the *in rem* administrative forfeiture of property seized"). Here, as in *Ruckelshaus*, we view PROMESA's failure to mention or provide for recourse against the Government as reflecting Congress's belief that the general grant of jurisdiction under the Tucker Act would provide the necessary remedy for any taking that may occur. *Ruckelshaus*, 467 U.S. at 1018–19; *see also id.* at 1017 ("[R]epeals by implication are disfavored." (quoting *Blanchette*, 419 U.S. at 133)).

As the Supreme Court explained in *Ruckelshaus*, the Tucker Act grants the Claims Court jurisdiction to render judgment upon certain claims against the United States founded on the Fifth Amendment of the Constitution as a money-mandating source "absent a clearly expressed congressional intention to the contrary." *Id.* at 1018. Here, we see no such expressed intention to withdraw Tucker Act jurisdiction. Therefore, the Claims Court correctly determined it had jurisdiction.

II

Turning now to Plaintiffs-Appellants' arguments, "[w]e review de novo the grant of a motion to dismiss for failure to state a claim." *Greenlee Cnty. v. United States*, 487 F.3d 871, 877 (Fed. Cir. 2007).

Plaintiffs-Appellants argue that the Claims Court's "ruling overlooks the well-established principle that government action authorizing a third party to take private

property can constitute a taking." Appellants' Br. 28. That is, they argue that "[b]ecause [the Oversight Board's] actions took place under the authority of PROMESA, a federal statute, the United States is liable for just compensation—as the Fifth Amendment requires." Appellants' Br. 33–34. We disagree.

Plaintiffs-Appellants contend their case is analogous to *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021), and *Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991), where the Government's authorization of third-party action gave rise to takings liability. But each of the cited cases is readily distinguishable because, in each, the Government *directly* took the property owner's right to exclude when it authorized the third party to enter onto private property. In *Loretto*, New York law required landlords to "permit a cable television company to install its cable facilities upon his property." 458 U.S. at 421. In *Cedar Point*, "[a] California regulation grant[ed] labor organizations a 'right to take access' to an agricultural employer's property in order to solicit support for unionization." 594 U.S. at 143 (citation omitted). And in *Hendler*, the "EPA issued an administrative order granting itself and the State of California access to plaintiffs' property for . . . locating, constructing, operating, maintaining, and repairing monitor/extraction wells." 952 F.2d at 1369 (internal quotation and citation omitted). In each of these cases, the Government compelled the property owners to suffer an invasion of their property. It is immaterial that the invasion was executed by a third party because it was the Government who directly took the property owner's right to exclude.

As we have explained, "[t]here is no per se rule either precluding or imposing liability when the government instigates action by a third party." *A & D Auto Sales*, 748 F.3d at 1153. Two broad principles guide our analysis when determining whether the government's instigation of

third-party action constitutes a taking. First, we ask whether the "effects on the plaintiff are merely unintended or collateral" such as where "the plaintiff was but one member of an affected class of persons." *Id.* Second, we ask whether "the third party is acting as the government's agent or the government's influence over the third party was coercive rather than merely persuasive." *Id.* at 1154.

The Claims Court concluded that, "even if [it] assumed that Congress intended the restructuring of COFINA's debts—despite the fact that PROMESA does not once mention COFINA—plaintiffs could not get past the second hurdle" above. *Dinh*, 166 Fed. Cl. at 531 ("[I]t is clear that plaintiffs could not establish either an agency relationship or coercion in this case as a matter of law."). We agree.

It is undisputed the Oversight Board is not an agent of the United States. *See* Appellants' Br. 8 (acknowledging "the Puerto Rico Oversight Board," is "not an agent of the United States"). Thus, we look for any liability arising out of coercion. "The question of coercion is . . . complex," and "[t]he line between coercion (which may create takings liability) and persuasion (which does not create takings liability) is highly fact-specific and hardly simple to determine." *A & D Auto Sales*, 748 F.3d at 1154. Coercion is a question of degree, and in *A & D Auto Sales*, we contrasted an embargo exerting "irresistible pressure" with the "friendly persuasion" of conditional economic and military aid in explaining what degree of coercion amounts to a taking. *Id.* at 1155.

Plaintiffs-Appellants also do not dispute that their theory depends on the Oversight Board's actions. *See, e.g.*, Appellants' Br. 19–20 (emphasizing that without Congress's enactment of PROMESA "there would have been no Oversight Board and no authority for that Board to destroy these property interests"). By creating a board that acts autonomously with "sole discretion" to take a broad range of actions, 48 U.S.C. § 2121(d)(1)(A)–(E), the Government

lacks the "ability to exercise general control over the [Board]'s action" or "compel specific action" emblematic of coercion. *A & D Auto Sales*, 748 F.3d at 1155. PROMESA simply incorporates bankruptcy law and provides Title III as avenue for restructuring debts. 48 U.S.C. § 2161 (incorporating numerous Title 11 bankruptcy provisions); *see generally id.* §§ 2161–78 (Title III) (providing for adjustment of debts). PROMESA also endows the Oversight Board with broad discretion to help Puerto Rico "achieve fiscal responsibility and access [] the capital markets." *Id.* § 2121(a). We agree with the Claims Court that providing Puerto Rico with additional tools to manage its economic security, as PROMESA does, does not equate to "the government instigat[ing] action by a third party." *A & D Auto Sales*, 748 F.3d at 1153; *see also B & G Enters., Ltd. v. United States*, 220 F.3d 1318, 1325 (Fed. Cir. 2000) ("Congress may have provided the bait, but [the state] decided to bite.").

While PROMESA undisputedly empowers the Oversight Board to initiate restructuring proceedings, the Oversight Board is not required to do so. The Oversight Board has discretion to determine whether such proceedings are warranted, and it is also vested with other powers to further its purpose, such as its ability to require budgets and reports on a monthly or quarterly basis from territorial instrumentalities. 48 U.S.C. § 2172; *id.* § 2121(d)(1)(B)–(C); *see also id.* § 2121(d)(2)(A) ("[The Oversight Board may in its] sole discretion . . . exclude any territorial instrumentality from the requirements of this chapter."); *id.* § 2161 (incorporating various bankruptcy provisions by reference). And when the Oversight Board initiates bankruptcy proceedings, "it acts not on behalf of the United States, but on behalf of, and in the interests of, Puerto Rico." *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 590 U.S. 448, 466 (2020). We thus agree with the Claims Court that the United States lacks the requisite amount of coercive

control over the Oversight Board's actions to create liability under the Fifth Amendment.

## III

Plaintiffs-Appellants also contend that the Claims Court erred by declining to allow them to amend their Complaint to cure any deficiencies. We review the denial of a motion to amend a complaint for abuse of discretion. *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1348 (Fed. Cir. 2015). Plaintiffs-Appellants' argument on appeal is conclusory and fails to explain how they would amend their complaint to establish government action or how any such edits would transform their allegations. Accordingly, we hold that the Claims Court did not abuse its discretion in declining to allow amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962) (identifying "futility of amendment" as a basis for denying leave to amend).

## CONCLUSION

We have considered Plaintiffs-Appellants' remaining arguments and do not find them persuasive. For the foregoing reasons, we affirm.

## **AFFIRMED**

### COSTS

No costs.